[Civ. No. 38032. Second Dist., Div. Four. Nov. 1, 1971.]

FARMERS AND MERCHANTS BANK OF LONG BEACH,
Plaintiff and Appellant, v.
BANK OF AMERICA, Defendant and Appellant;
PEERLESS INSURANCE COMPANY, Defendant and Respondent.

940

COUNSEL

Robert H. Fabian, Harris B. Taylor, Ullar Vitsut and George J. Brusky, Jr., for Defendant and Appellant.

Joseph E. Madden, Wise, Kilpatrick & Clayton and George E. Wise for Plaintiff and Appellant.

Anderson, McPharlin & Connors and Peter R. Regal for Defendant and Respondent.

OPINION

**KINGSLEY, J.**—This action arose out of a dispute between Farmers and Merchants Bank of Long Beach (hereinafter called Farmers and Merchants) and Bank of America National Trust and Savings Association (hereinafter called Bank of America) with respect to whether each of the banks properly returned a set of checks to each other before midnight of the next business day after receipt, as required by former section 1013 of the Financial Code. Farmers and Merchants filed an action for declaratory relief naming Bank of America in the complaint's first count and Peerless Insurance Company, its bonding company, in the second count.

The Bank of America appealed from the judgment against it, and Farmers and Merchants filed a protective cross-appeal against Peerless Insurance Company (hereinafter called Peerless) to provide for the possibility that the appellate court might reverse the judgment against Bank of America. Peerless is a corporation which undertook to hold Farmers and Merchants harmless in an amount not exceeding $1,000,000 for loss of property through larceny, theft or false pretenses.

This litigation arose as a result of a check kiting scheme perpetrated against both the Bank of America and Farmers and Merchants by Luther Hester. Upon discovery of the scheme, the Bank of America attempted to dishonor 11 checks totaling $72,562.32, while Farmers and Merchants returned 5 checks totaling $26,392.36.

The parties below stipulated that Farmers and Merchants suffered a loss of $15,358.09 when the checks introduced into evidence as Exhibits A-F were charged against Hester's account with Farmers and Merchants after Bank of America refused return of the checks. (The total of checks A-F was $27,016.90, but the final overdraft with Farmers and Merchants amounted to a loss of $15,358.09.) Farmers and Merchants suffered a further loss of $20,536.42 when checks drawn on Hester's account with Bank of America (Exhibits 1-4) were returned, dishonored, to Farmers and Merchants by Bank of America.

Eleven checks (Exhibits 1-11) had been delivered by Farmers and Merchants to a Bank of America messenger who delivered the checks to the Bank of America's Southwest Erma Computer where the checks were sorted out. These checks were then sent to the Montebello computer where most of the branches' bookkeeping services were performed. The Montebello computer did such things as: place the checks in numerical sequence according to the depositor's account number; match the balance against the amount of the check; reject the check if the amount was more than the balance; deduct the check from the balance if the amount was sufficient; automatically prevent processing of a check where there was a stop payment; print the status of accounts and perform other bookkeeping functions that used to be performed at the branch. The checks were later sent to Bank of America's Harbor-Orangewood branch, where Hester maintained an account.

The court found that Bank of America failed to dishonor checks, represented as Exhibits 1-4, in the sum of $20,536.42, within the time allowed by law. The court also found that Bank of America did not timely dishonor two checks that were Exhibits 8 and 9, totaling $10,686.58. The court also found that checks drawn on Farmers and Merchants, and introduced into evidence as Exhibits A through F, were not dishonored by Farmers and Merchants within the time allowed by law. The court ordered judgment against Peerless for $4,671.51, and interest, which was the difference between the stipulated loss of Farmers and Merchants in the total sum of $35,894.51, and the amount of $31,223, plus interest, which Farmers and Merchants was entitled to recover from Bank of America.

## I

The central issue before the court below was whether both the Bank of America and Farmers and Merchants were barred from returning their respective sets of checks to each other because each of them held the checks beyond the time limits prescribed by section 1013 of the Finan-

cial Code.[1] In order to decide the correctness of the court's holding it becomes necessary to determine whether the time set forth under section 1013 begins to run when the checks were delivered to Bank of America's Montebello computer center (as held by the court below), or whether the statutory time begins to run after their arrival at the Harbor-Orangewood branch, as appellant, Bank of America, urges upon us. Assuming that receipt of the checks by the Montebello computer center was receipt by the drawee branch within the meaning of section 1013, then the trial court correctly found that Exhibits 1-4 and 8 and 9 were not dishonored in time, since these checks were returned after midnight of the next business day after receipt.[2]

Bank of America argues that the Harbor-Orangewood branch is a separate bank under section 1012 and section 1018 of the Financial Code, and that time should run from receipt at that office and not from receipt at the Montebello computer. Section 1012 of the Financial Code provides in part: ". . . (c) each branch or office of a bank shall be deemed a separate bank."

Section 1018 of the Financial Code, as in effect at the time of the transaction involved, provides in part: "An item . . . received for . . . collection . . . at any other office of the same bank, shall be deemed for all the purposes of this article as . . . payable at another bank."

The fact that the Harbor-Orangewood branch is a "branch or office" and therefore a "separate bank" within the meaning of the above code section, in no way negates the fact that the Montebello computer center is part of that branch for purposes of section 1013. The testimony set forth in the facts clearly shows that the Montebello computer center mainly performed the Harbor-Orangewood branch's bookkeeping functions and

---

[1]Section 1013 of the Financial Code read in part: "In any case in which a bank receives, other than for immediate payment over the counter, a demand item payable by, at or through such bank and gives credit therefor before midnight of the day of receipt, the bank may have until midnight of its next business day after receipt within which to dishonor or refuse payment of such item. Any credit so given together with all related entries on the receiving bank's books, may be revoked by returning the item, or if the item is held for protest or at the time is lost or is not in the possession of the bank, by giving written notice of dishonor, nonpayment, or revocation; provided, that such item or notice is dispatched in the mails or by other expeditious means not later than midnight of the bank's next business day after the item was received. For the purpose of determining when notice of dishonor must be given or protest made under the law relative to negotiable instruments, an item duly presented, credit for which is revoked as authorized by this article, shall be deemed dishonored on the day the item or notice is dispatched. A bank, revoking credit pursuant to the authority of this article, is entitled to refund of, or credit for, the amount of the item."

[2]The relevant dates are as set forth in the attached appendices.

those acts that were performed by the computer were not performed in the Harbor-Orangewood office. Prior to the formation of the Montebello computer center, the acts being performed by the Montebello computer were performed manually by employees at the Harbor-Orangewood branch. All these facts tend to support the trial court's finding that the Montebello computer was part of the Harbor-Orangewood branch within the meaning of former section 1013 of the Financial Code.[3]

Statutes in other states similar to Financial Code section 1013 have been strictly construed[4] as to the time limit.

Since the Bank of America failed to return checks 1-4, 8 and 9, and A through F before midnight of the next business day after receipt by the Montebello computer center, those checks were returned beyond the time limit of section 1013.

## II

■ The Bank of America argues that the evidence does not support a judgment as to exhibits 8 and 9 because, by stipulation of the parties, exhibits 8 and 9 (totaling $10,686.58) should not have been considered in arriving at the total for which the Bank of America was to be held liable to Farmers and Merchants. It is apparent that this is correct. Under the stipulation, only Exhibits 1-4, totaling $20,536.42, were to be considered in connection with the Bank of America returns. It follows that the judgment against it should, as to those items, have been in that amount and no more. However, the stipulation also provides that the total loss to Farmers and Merchants was $35,894.51. Therefore, the judgment in favor of Farmers and Merchants as against Peerless was less than it should have been; the proper amount of that judgment should have been $15,358.09, plus interest (the amount of the checks drawn on Farmers and Merchants and not returned by it within time).

## III

Bank of America's final argument is that any judgment for Farmers and Merchants should be entered against Peerless and not Bank of America because Peerless is, in substance, a surety seeking subrogation to the rights of Farmers and Merchants against Bank of America with-

[3]For the purposes of this appeal, we accept the trial court's theory that receipt by the "Erma" computer, which merely sorted out checks, was not a receipt of checks by the Harbor-Orangewood branch.

[4]See *General Finance Corp. of Fla.* v. *Central B. & T. Co.* (5th Cir. 1959) 264 F.2d 869; *Wisner* v. *First National Bank of Gallitzin* (1908) 220 Pa. 21 [68 A. 955].

out sustaining the burden of proof which would entitle Peerless to such right of subrogation. Bank of America argues that Peerless, as a compensated surety, has the burden of proof placed upon it before it can shift the loss to the Bank of America. (*Patent Scaffolding Co.* v. *William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506, 509-510 [64 Cal.Rptr. 187].) The contention is without merit. Peerless is not suing Bank of America for subrogation, but is defending itself in a suit brought to determine how much of the loss was incurred by each of the banks under the Financial Code. This case does not involve a shifting of loss to a wrongdoer, but rather a fixing of loss on each bank, and therefore is not a suit for subrogation.

It is true that, by refusing to pay its insured, and inducing the insured to sue the drawee bank directly, Peerless secures an economic position better than if it had paid its insured and then sued as subrogee. But that is not the only situation in which the law restricts a party seeking affirmative relief more severely than it does the same party acting only defensively. We note that, in the case at bench, the ultimate tactical decision, which results in the judgment against Bank of America, was that of Farmers and Merchants and not of Peerless. Farmers and Merchants could have sued Peerless on the bond, without joining or involving Bank of America. By the same token, Farmers and Merchants could have elected to sue the Bank of America, only, in which action the Peerless bond would have been immaterial. We can see no reason why the Bank of America can or should complain of the result herein achieved.[5]

The judgment is modified by deleting paragraphs 1 and 2 thereof and substituting the following paragraphs in lieu thereof:

"1. That plaintiff Farmers and Merchants Bank of Long Beach have judgment against the defendant Bank of America National Trust and Savings Association for the sum of $20,536.42, with interest thereon from October 14, 1964, at the rate of 7 per cent per annum.

"2. That plaintiff Farmers and Merchants Bank of Long Beach have judgment against the defendant Peerless Insurance Company for the sum of $15,358.09, with interest thereon from October 14, 1964, at the rate of 7 per cent per annum."

---

[5] In light of the view we take of the governing law, we need not determine whether the terms of the stipulation operate to estop the Bank of America from raising the contention herein discussed. That part of the stipulation reads as follows:

"4. That said loss of plaintiff, over and above any amounts as may be recovered by plaintiff in this action from the defendant BANK OF AMERICA, may be recovered from the defendant PEERLESS INSURANCE COMPANY pursuant to Bond No. F-31-92-72."

As so modified, the judgment is affirmed; each party shall bear its own costs in this court.

Jefferson, Acting P. J., and Dunn, J., concurred.

A petition for a rehearing was denied November 19, 1971, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied December 29, 1971.

### Appendix A—Checks Drawn on Bank of America and Returned to Farmers and Merchants Bank

#### (1964)—[Clerk's Transcript, pp. 72-88]

| Exh. No. | Amt. | Date Rec'd by B of A | Date Provisional Credit Given to F & M | Date Rec'd— Southwest ERMA Computer | Date Rec'd By Montebello Computer | Date Rec'd— By Drawee Branch of B of A | Date F & M Notified by Phone of Rejection | Date Check Returned to F & M |
|---|---|---|---|---|---|---|---|---|
| 1 | $ 6,394.15 | 10/8 | 10/9 | 10/8 | 10/12 | 10/13 | 10/14 | 10/15 |
| 2 | 3,955.16 | 10/8 | 10/9 | 10/8 | 10/12 | 10/13 | 10/14 | 10/15 |
| 3 | 4,121.36 | 10/8 | 10/9 | 10/8 | 10/12 | 10/13 | 10/14 | 10/15 |
| 4 | 6,065.45 | 10/8 | 10/9 | 10/8 | 10/12 | 10/13 | 10/14 | 10/15 |
| 5 | 7,014.30 | 10/8 | 10/9 | 10/8 | 10/12 | 10/13 | 10/13 | 10/15 |
| 6 | 7,934.55 | 10/9 | 10/12 | 10/9 | 10/12 | 10/13 | 10/13 | 10/14 |
| 7 | 8,853.08 | 10/9 | 10/12 | 10/9 | 10/12 | 10/13 | 10/13 | 10/14 |
| 8 | 5,897.39 | 10/12 | 10/13 | 10/12 | 10/13 | 10/15 | 10/15 | 10/16 |
| 9 | 4,789.19 | 10/12 | 10/13 | 10/12 | 10/13 | 10/15 | 10/15 | 10/16 |
| 10 | 9,863.67 | 10/13 | 10/14 | 10/13 | 10/15 | 10/16 | 10/16 | 10/17 |
| 11 | 7,674.02 | 10/13 | 10/14 | 10/13 | 10/15 | 10/16 | 10/16 | 10/17 |
| | $72,562.32 | | | | | | | |

DAY OF WEEK FOR APPLICATION OF FINANCIAL CODE § 1013:

| | | | |
|---|---|---|---|
| 10/8 | THURSDAY | 10/12 | MONDAY |
| 10/9 | FRIDAY | 10/13 | TUESDAY |
| 10/10 | SATURDAY | 10/14 | WEDNESDAY |
| 10/11 | SUNDAY | | |

### Appendix B—Checks Drawn on Farmers and Merchants Bank and Returned to Bank of America

#### (1964)—[Clerk's Transcript, pp. 72-88]

| Exh. | Amt. | Date Rec'd By F & M From Federal Reserve Bank | Date Rec'd By F & M Computer | Date Rec'd By F & M From Computer | Date Returned to Federal Reserve Bank |
|---|---|---|---|---|---|
| A | $ 5,502.06 | 10/12 | 10/12 | 10/13 | 10/14 |
| B | 8,709.73 | 10/12 | 10/12 | 10/13 | 10/14 |
| C | 9,579.08 | 10/12 | 10/12 | 10/13 | 10/14 |
| D | 1,624.91 | 10/12 | 10/12 | 10/13 | 10/14 |
| F | 976.58 | 10/12 | 10/12 | 10/13 | 10/14 |
| | $26,392.36 | | | | |