341 So.2d 1025 (1977)
CAPITAL CITY FIRST NATIONAL BANK, a National Banking Corporation, Appellant,
v.
LEWIS STATE BANK, a Florida Banking Corporation, Appellee.
No. BB-87.
District Court of Appeal of Florida, First District.
January 19, 1977.
Rehearing Denied February 22, 1977.
*1026 C. Gary Williams, of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee, for appellant.
John D. Buchanan, Jr., of Henry & Buchanan, P.A., Tallahassee, and Charles W. Pittman, of MacFarlane, Ferguson, Allison & Kelly, Tampa, for appellee.
SMITH, Judge.
Between June 19 and 25, 1974, two checks drawn by the distressed Commonwealth Corporation on uncollected funds were, as one witness put it, "floating around Tallahassee looking for a home." Both checks, totaling $150,000, were drawn by Commonwealth to the order of Commonwealth on its account at Florida State Bank of Tallahassee. Commonwealth deposited the first check, for $10,000, in its account at appellant Capital City First National Bank on June 19, and received credit which Commonwealth immediately used. The second check, for $140,000, was similarly deposited at Capital City the next day, June 20. Florida State, the payor bank, dishonored the two checks and gave notice of dishonor following an intervening weekend, on June 24 and 25. Between their deposit and subsequent dishonor, the checks were handled by appellee Lewis State Bank, which accepted Florida State's dishonor of the checks, rescinded its prior charges to Florida State's account at Lewis, and sued Capital City, the depositary bank which refused to recognize Florida State's dishonor of the checks.
The issue is whether the loss properly falls on Capital City, as held by the circuit court, or on Lewis. Resolution of that issue is controlled by whether Florida State timely dishonored the checks before midnight of the banking day following "presentment" to Florida State. That determination in turn depends on whether delivery of the checks to Lewis and Lewis' handling of them in its proof and transit department on June 20 and 21 was in effect presentment to Florida State, commencing the period for payment or dishonor and rendering tardy Florida State's notices of dishonor on June 24 and 25. The trial court held that presentment to Florida State did not occur when Lewis received the checks and that Lewis' handling of the checks in its proof and transit department on June 20 and 21 was only as an "intermediary collecting bank," not as Florida State's agent to receive presentment. Capital City appeals from the adverse judgment on the principal matter in issue and Lewis cross-assigns error in the trial court's refusal to award interest.
Some of the pertinent statutes are § 673.504, F.S. 1973, "How presentment made":

*1027 "(1) Presentment is a demand for acceptance or payment made upon the ... payor by or on behalf of the holder.
"(2) Presentment may be made:
(a) By mail, in which event the time of presentment is determined by the time of receipt of the mail; or
(b) Through a clearing house; or
(c) At the place of acceptance or payment specified in the instrument... .
"(3) [Presentment] may be made:
.....
(b) To any person who has authority to make or refuse the acceptance or payment."
Sec. 673.506, F.S. 1973, "Time allowed for acceptance or payment":
"(1) Acceptance may be deferred without dishonor until the close of the next business day following presentment... ."
Sec. 673.508(2), F.S. 1973, "Notice of dishonor":
"Any necessary notice [of dishonor] must be given by a bank before its midnight deadline [the next banking day, § 674.104(h)]... ."
Sec. 674.107, F.S. 1973, "Time of receipt of items":
"(1) For the purpose of allowing time to process items, prove balances and make the necessary entries on its books to determine its position for the day, a bank may fix an afternoon hour of two p.m. or later as a cut-off hour for the handling of money and items and the making of entries on its books.
"(2) Any item ... received on any day after a cut-off hour so fixed or after the close of the banking day may be treated as being received at the opening of the next banking day."
Sec. 674.202(2), F.S. 1973, "Responsibility for collection; when action seasonable":
"A collecting bank taking proper action before its midnight deadline [the next banking day, § 674.104(h)] following receipt of an item ... acts seasonably... ."
Sec. 674.204, F.S. 1973 "Methods of sending and presenting; sending direct to payor bank":
"(2) A collecting bank may send:
(a) Any item direct to the payor bank;
.....
"(3) Presentment may be made by a presenting bank at a place where the payor bank has requested that presentment be made."
The odyssey of the second or $140,000 check deposited to Commonwealth's account at Capital on June 20 was at every stage a banking day later, but otherwise identical to, that of the first or $10,000 check deposited Wednesday, June 19. The issues in the case may conveniently be discussed in terms of the first check. As the depositary bank, Capital had initial control of the manner of presentment of that check to the payor bank, Florida State. Capital might have physically delivered the check for presentment over the counter at Florida State; it might have mailed the check to Florida State for presentment; or it might have included the check in the sack of other checks delivered the night of June 19 to the Federal Reserve Bank of Jacksonville, which would have granted Capital City provisional credit on the morning of June 20 and made presentment to Florida State that morning. If by either of those methods Capital City had forwarded the check for ultimate presentment, and presentment had occurred on Thursday, June 20, Florida State's deadline to dishonor the check would have been midnight of the following day, Friday, June 21, and the check would by law then be deemed finally paid and not subject to dishonor by Florida State on the following banking day, Monday, June 24. Capital City did not so route the check, but sent it the morning of Thursday, June 20, together with other checks held on Tallahassee banks, for handling in the local clearinghouse which Tallahassee banks employ to exchange and provisionally credit items requiring presentment in Tallahassee.
*1028 The heart of Capital City's position in this case is the assertion, well documented in this record, that a depositary bank which holds and has granted a depositor credit for a check drawn on another bank has as its primary purpose speedy presentment for payment by the payor. But, the record likewise demonstrates, that purpose may be overridden in favor of a slower method when distance or collection expense are substantial factors. It would not do to mail a check directly for presentment to a New York bank payor, for example, because the mails would delay use of the funds by the depositary bank, which may obtain them provisionally by negotiating the check to a nearby intermediary collecting bank. While a check thus negotiated goes its slower way to New York, the bank of deposit may enjoy use of the provisional credit granted by the collecting bank. The bank of deposit might hasten both provisional and final credit by dispatching an airborne courier to New York with the check, but collection costs would soar.
To serve common objectives of obtaining speedy provisional and final credit, at low collection cost, Tallahassee banks before 1928 instituted a clearing arrangement for locally destined checks. It replaced check-bearing couriers criss-crossing the town bent on presentment and obviated unsporting delays accomplished by banks which paid their local obligations with checks on accounts at distant banks. Four Tallahassee banks thenceforth adhered to a local clearinghouse arrangement whereby each day, at sites rotating among the participants, representatives of the four would meet, provisionally exchange and balance their mutual obligations, and give or receive net payments.
In time a solution was found for the cumbersome assembly of representatives of a growing number of participant banks and for delays in obtaining provisional credit caused by settling daily clearings with checks which themselves required collection. In 1968 the bank which is now Barnett Bank of Tallahassee undertook, for a fee, to collect accumulated checks from banks twice daily, to prepare a settlement sheet and to communicate to each participant bank the amount of its net provisional credit or obligation. Acting as the clearinghouse, Barnett Bank of Tallahassee by telephone caused provisional charges and credits to be made in the accounts of participating banks at Barnett Bank of Jacksonville. That was done following the morning clearing  we are not here concerned with the afternoon clearing  by noon or 12:30 each day. The clearinghouse then delivered the checks in batches to appropriate payor banks.
The recent advent of sophisticated computerized banking services both simplified and, as this case testifies, complicated the Tallahassee clearinghouse arrangement. The computer's speed and economy in sorting items, proving balances, identifying individual accounts and posting charges and credits made it desirable for all Tallahassee banks with which we are concerned to engage computer services; but, while Capital City and Lewis among others invested in the hardware and human skills necessary for computerized banking, others, including the relatively new Florida State Bank, did not. Those that did sold their computer services to those that didn't. Thus, Lewis sold services to Florida State, and undertook by contract with Florida State to receive and process Florida State checks, including checks endorsed and forwarded for collection by the Federal Reserve Bank of Jacksonville, checks presented over the counter at Florida State and checks delivered through the Tallahassee clearinghouse by other local banks for presentment to Florida State. Florida State furnished Lewis records of its customer accounts and Lewis assimilated them in its computer system.
To gain rapid computer access to Florida State checks processed through the local clearinghouse, Florida State through Lewis directed Barnett, manager of the Tallahassee clearinghouse, to deliver Florida State checks to Lewis and to regard them as drawn on Lewis for purposes of calculating provisional charges and credits in daily settlements *1029 among participant banks. Lewis made a similar request for Gulf National Bank checks. Thus, Lewis received from the morning clearing not only its own checks but also those drawn on Florida State or Gulf National. By similar arrangements not directly pertinent here, Capital City received from the morning clearing checks drawn on Industrial National Bank, Capital City Second National Bank and City National Bank, as well as its own.
The morning of June 20, the day after Commonwealth deposited its ill-fated check on Florida State with Capital City, Capital City readied that check and approximately 250 others drawn on Lewis, Florida State and Gulf National for pickup by the clearinghouse courier. They were batched together, without differentiation among the three payor banks, under a machine tape showing the dollar total of the batch. Other batches, destined for clearing to other participant banks, were similarly prepared. The clearinghouse courier made his morning rounds, Barnett prepared the usual settlement sheet account for all items processed in batches that morning, the courier delivered copies of the settlement sheet and the appropriate batches of checks to the participant banks or those banks designated by other banks to receive their checks, and Barnett Bank of Jacksonville adjusted accounts to effectuate net provisional settlements.
Thus, between noon and 12:30 on Thursday, June 20, the Commonwealth check was delivered in an undifferentiated batch, with other batches from clearing, to Lewis. Lewis received them not at its downtown banking house but rather at the Lewis State Bank Data Processing Center, 13 blocks away. That building housed Lewis' computer hardware and operators and, insofar as here pertinent, two separate departments whose heads reported through different channels in Lewis' hierarchy: the proof and transit department and the data processing department. The relevant function of proof and transit was to receive and sign for incoming deliveries both from local clearings and from the Federal Reserve Bank of Jacksonville; to sort the batches into groups of checks drawn on Lewis, Florida State and Gulf National; to prove the dollar amount of items received against the machine tape totals claimed by local originating banks and carried forward in aggregate on Barnett's settlement sheet; to provisionally charge against accounts maintained at Lewis by Florida State and Gulf National the dollar total of checks drawn against them  thus recouping for Lewis the provisional charges made against its Jacksonville account for Florida State and Gulf National checks cleared to Lewis; to microfilm the checks; to endorse them with Lewis' stamp; and to deliver them to the data processing department.
The essential function of the data processing department, housed in the same building as proof and transit, was to receive checks from proof and transit; to post charges to customer accounts of Florida State, Gulf National and Lewis; and to make ready for pickup by Florida State and Gulf National, in early morning of the next banking day, the checks drawn on those banks, with appropriate records of their handling by Lewis.
Lewis' proof and transit department sorted the checks received by it from the morning clearing of June 20, proved the totals, otherwise normally processed nearly all the checks drawn on Florida State and delivered them before 2:00 p.m. to data processing. But the Commonwealth check on Florida State was not among those delivered because its routing numbers had been improperly encoded on the face of the check, through no fault of Capital City, and the computer sorter employed by proof and transit could not identify the check as being drawn on Florida State. The check therefore missed the routine delivery to data processing and required individual handling by proof and transit which was not complete by 2:00 on June 20.
Although Capital City invariably completed on the day of receipt all processing of checks cleared to it for Industrial National, Capital City Second and City National, other arrangements had been made between *1030 Lewis and Florida State. Florida State ended its banking day at 2:00 p.m. and was accustomed to adjusting its reserves each day in reliance on notification at 2:00 p.m. of the amount of the gross provisional charge made to Florida State's account at Lewis by Lewis' proof and transit department. In 1973, Florida State had been embarrassed in the daily adjustment of its reserves by Lewis' addition of slower moving charges to Florida State's account after the 2:00 p.m. notification. Florida State had therefore requested that charges processed after the 2:00 p.m. notification be "held over and charged to our account the following business day." Lewis agreed, but did not notify Capital City or other Tallahassee depositary banks whose final payment of Florida State checks sent through the clearinghouse were to be so delayed.
The Commonwealth check deposited at Capital City on June 19 and cleared to Lewis on June 20 was ready for delivery by Lewis' proof and transit department to Lewis' data processing department after 2:00 p.m. on June 20, and was held over for delivery with Florida State checks to be received and processed before 2:00 p.m. the next day. On June 21, Lewis' proof and transit charged Florida State for the check; and data processing received the check and posted a charge to the Florida State record of Commonwealth's account. The check was physically delivered by Lewis to Florida State early Monday, June 24.
On Monday morning, Florida State's president, who on Friday afternoon had placed "hold orders" on all six Commonwealth checking accounts and had dispatched a messenger to notify Lewis' data processing department, dishonored the Commonwealth check and notified both Capital City and Lewis that the check was being returned. In a telephone conversation with Capital City's president, Florida State's president verbally acquiesced in or agreed to Capital City's assertion that the Commonwealth check had been presented to Florida State for payment on Thursday, June 20, not on Friday, June 21, and that Florida State's refusal of the check on Monday, June 24, was a day late. Although that verbal exchange produced an admission by Florida State of the untimeliness of its dishonor, it was not regarded by the trial court as estopping Florida State, not a party to this action, or Lewis. Capital City took no action in reliance on the verbal concession by Florida State.
Capital City refused to accept back the Commonwealth check from Florida State and refused to reverse the tentative settlement in favor of Capital City which had been made on account of that check in the clearings on June 20. Although the Tallahassee banking custom was one of "direct return" of dishonored items to the bank of deposit, Florida State returned the check to Lewis, which accepted it as timely dishonored and credited the amount of it back to Florida State's account at Lewis.
As stated above, the second Commonwealth check in the amount of $140,000 was identically treated: it was deposited by Commonwealth to its Capital City account on June 20; sent by Capital City to the clearinghouse on the morning of June 21 and cleared to Lewis around noon on that day; rejected by the computer sorter operated by Lewis' proof and transit department because the routing numbers on its face did not correctly identify the payor bank; held over by proof and transit at 2:00 p.m. on June 21 for delivery on the next banking day, June 24, to Lewis' data processing department; posted by data processing to Commonwealth's Florida State account on the 24th; physically delivered to Florida State on the morning of the 25th; and dishonored by Florida State on the 25th.
The central issue in Lewis' claim is whether, as to each check  again, we will speak only of the first  Florida State timely dishonored it. Granting Florida State until midnight of the banking day following presentment to give notice of dishonor, §§ 673.506, .508(2), F.S. 1973, supra, the question becomes whether presentment was made to Florida State on Thursday, June 20, when the check was processed by Lewis' *1031 proof and transit department, or on Friday, June 21, when it was processed by Lewis' data processing department. Lewis concedes for purposes of argument that presentment was made to Florida State at Lewis' data processing department on Friday, June 21. Capital City contends that presentment to Florida State was accomplished by the check's delivery to Lewis from clearing on Thursday, June 20, or by its handling by Lewis' proof and transit on that date; or, alternatively, that Lewis defaulted in a duty to make speedy presentment of the check within Lewis' own building on June 21, or defaulted in a duty to advise Capital City the 2:00 p.m. deadline on charges by Lewis to Florida State would delay presentment. The issue was narrowed in pretrial conferences to one question: was Lewis an "intermediary collecting bank" in its relationship to Capital City and Florida State, so that delivery of the check to Lewis from clearings on June 20 imposed only the obligation to present the check the following day, § 674.202(2), F.S. 1973, supra; or was Lewis, by reason of authority received and exercised under its data processing contract with Florida State, Florida State's agent to receive presentment, in which case Florida State through Lewis received presentment on Thursday, June 20, and had only until midnight Friday to dishonor?
The trial court found, as a matter of mixed law and fact, that Lewis "was performing the functions of an intermediary collecting bank with respect to the two checks sued upon," and consequently that presentment did not occur when Lewis received and processed the checks in its proof and transit department. Thus, the trial court held Florida State's notices of dishonor were timely and that Lewis is entitled to recover the amount of the checks from Capital City.[1] The trial court refused to award Lewis interest on the debt on grounds Lewis' complaint demanded interest at "the average daily Federal funds rate" but Lewis introduced no evidence identifying that rate. The court ruled that Lewis, having failed to prove the special interest rate it alleged the parties contracted for, was not entitled to interest at the statutory legal rate of six percent. Sec. 55.03, F.S. 1973.
At the end of the trial, in which witnesses repeatedly emphasized the bankers' desire to obtain provisional and final credit for items in transit as quickly and directly as possible, the trial judge adjourned to consider his decision and instructed counsel, who had offered to send a copy of any controlling precedent that might be discovered:
"THE COURT: I would dearly love for you to send me a case. And don't send it by any slow method. Send it by the fastest most direct method."
At the conclusion of two hours' oral argument of this appeal, we shared that yearning.
It is appropriate to recognize that the trial court was obliged, as are we, to decide this case without the influence of arguments that might naturally have been advanced by the payor bank, had it become embroiled in the litigation. In resolving this private controversy between Lewis and Capital City, it is not for us to dwell unduly on Lewis' possible reasons for reversing, with such alacrity, its charges to Florida State. But recognizing that our decision may be regarded as precedent for the resolution of other bankers' disputes, or for adjustment of their affairs by contract, we cannot entirely ignore the potential arguments, as we are able to discern them, of the payor bank. One such argument suggests a reason for Florida State's absence from this litigation  a reason more significant than Lewis' presumed desire not to offend its substantial depositor and data processing customer  and brings into sharp focus Lewis' basic premise that presentment could not occur until Florida State or Lewis, acting for Florida State, possessed at *1032 the same time and place both the check and sufficient information, not available at its proof and transit department, to decide to pay or not.
Florida State's notice of dishonor was effective against Lewis on Monday morning, June 24, regardless of whether presentment is considered to have occurred on Friday, June 21, when the Commonwealth check was posted to Commonwealth's account at Florida State on Lewis' data processing records, or on Monday, June 24, when the check was first delivered to Florida State. In either event, Florida State acted to dishonor the check before its midnight deadline on the banking day following presentment. But, had Florida State not been removed from the controversy by Lewis, Florida State surely might have contended at least alternatively that it could not receive presentment until it received the check itself, so to verify the signature and complete the statutory "process of posting" which Florida State was entitled to accomplish as an element of final payment. Secs. 674.213(1)(c), .109, F.S. 1973.
Such an argument, though entirely plausible under the Code, was more than Florida State needed to prevail against Lewis; but if made, that argument could seriously jeopardize Lewis' case against Capital City. For it would show Lewis as a collecting bank  Lewis' own characterization of itself  which received the check June 20 but did not perform its statutory duty to present or send the check for presentment "before its midnight deadline following receipt of an item," i.e., by midnight June 21. Secs. 674.202, .204, F.S. 1973. Hence, Lewis "concedes," for purposes of this case, that presentment to Florida State occurred in the Lewis State Bank Data Processing Center on June 21, when data processing posted a charge to Commonwealth's account. That was before any officer of Florida State had seen the check or knew of it.
A thread of ambiguity therefore runs through the testimony and through Lewis' basic premise that presentment could not occur at proof and transit, but only at data processing, where sufficient information existed for a decision to pay or not. Lewis' manager of data processing, where presentment "concededly" occurred, testified:
"Q. Now at your Department do you make any determination to pay or not to pay?
"A. We do not.
"Q. Who makes that determination?
"A. Florida State Bank."
But Florida State's president described his understanding of presentment and response this way:
"I understand they would come in a mixed batch; that is, with other checks that Lewis State Bank was performing a similar function on, and would be separated, provisional settlement would be made against Florida State Bank['s] account with Lewis State Bank, they would be microfilmed, and then they would be presented for payment to the Lewis State Bank Data Processing Center."
.....
"So when they go to Data Processing and are presented for payment, then we make a determination of whether we will pay, return, or what we'll do" (emphasis added).
Florida State's president did not explain how, at Lewis' data processing department, "we," meaning Florida State, "make a determination of whether we will pay, return, or what we'll do."
Lewis' position is therefore quite discreet: (1) Lewis denies that presentment to Florida State occurred on June 20 in Lewis' proof and transit department; (2) Lewis does not deny that presentment occurred on June 21 in its data processing department; and (3) Lewis does not deny, because the matter is not here in issue, that presentment occurred on June 24 when the check was physically sent to Florida State.
The controversy cannot properly be resolved by forcing the facts into syllogisms that beg the main question of whether Lewis' proof and transit department was the "place" or "person" designated by Florida State to receive presentment of its *1033 checks. Section 673.504(3)(b), .204(3), F.S. 1973. It is unavailing for Capital City to urge presentment at Lewis' proof and transit department must have occurred June 20, since no prudent depositary bank would knowingly choose a collection method which delayed presentment until June 21 in preference to collection through Federal Reserve Bank of Jacksonville, which would have made presentment June 20. As depositary bank and the original collecting bank, Capital City was obliged by the law of self-interest, but by no other law or practice, to select the most appropriate collection method. It was obliged to know, for example, that Florida State could lawfully fix 2:00 p.m. "as a cut-off hour for the handling of money and items and the making of entries on its books," § 674.107(1), F.S. 1973, and that Florida State had done so. Capital City was obliged to inform itself of potential delays in alternative collection processes available, and to choose wisely.
Nor is the question entirely answered by Lewis' reasoning that, since it was an "intermediary" and "collecting" bank in the statutory sense of any bank handling an item for collection except the depositary or the payor bank, § 674.105(3), (4), F.S. 1973, its proof and transit department could not also be the place or person designated by Florida State for receipt of presentment. Sections 673.504 (3)(b), .204(3), F.S. 1973. In the latter section, the Uniform Commercial Code specifically recognizes that computerized banking may make it appropriate for a payor to designate a computer center as the place of presentment. See Comment 4 to § 4-204, U.C.C., 19B F.S.A. § 674.4-204 at 379 (1966). If a nonbank commercial data processing center is designated by the payor bank as the place of presentment, presentment there is effective notwithstanding that the intake department performs the sorting, proving, microfilming, and notification functions here performed by Lewis' proof and transit department. Similarly, if a bank operates a data processing service for other payor banks within or without its banking house, designation of the data processing bank as the place of presentment is not made ineffective by the simple fact the bank "handles" the item for collection and is, therefore, a "collecting bank." Section 674.105(4), F.S. 1973. We accept as true the trial court's finding that Lewis was an "intermediary collecting bank," but we do not draw the legal implication urged by Lewis, that it (more precisely, its proof and transit department) was thereby disqualified as the place for presentment. With that erroneous implication falls Lewis' argument that, since proof and transit gave Capital City provisional credit,[2] made a provisional charge against and so notified Florida State, and microfilmed and endorsed the Commonwealth checks, it could not be the place for presentment.
Neither can we accept Lewis' argument that the personnel of its proof and transit department had no more authority than the guard at the door "to make or refuse the acceptance or payment," § 673.504(3)(b), F.S. 1973, and therefore cannot have been the persons or place designated for presentment. Section 673.504(2)(a), F.S. 1973, also makes presentment by mail effective at "the time of receipt of the mail," and it matters not that the person who receives and opens the mail is a clerk ignorant of information essential to the decision to pay or refuse. Moreover, Lewis' argument that presentment cannot be made except to one having both information and *1034 authority to pay or dishonor proves too much. For the previously-quoted testimony of both Lewis' manager of data processing and Florida State's president proved, if nothing else, that only Florida State had authority to pay or refuse. Thus by Lewis' reasoning presentment would be delayed, in the face of Lewis' "concession" and its expert testimony,[3] until the Commonwealth check reached Florida State on Monday, June 24. When § 673.504(3)(b) speaks of presentment "to any person" with authority to pay or refuse, it speaks not only of individuals but also of organizations, and the term "organization" does not differentiate between departments of a single corporate entity. Sec. 671.201(28), (30), F.S. 1973.
This case combines significant circumstances  presentment through a clearinghouse and a payor bank's use of offsite computer processing  which were separately considered in Geibe v. Chicago Lake State Bank, 160 Minn. 89, 199 N.W. 514 (1924) and Farmers and Merchants Bank of Long Beach v. Bank of America, 20 Cal. App.3d 939, 98 Cal. Rptr. 381 (1971). In Geibe, under Negotiable Instruments Law provisions similar to those of the Commercial Code now applicable in Florida, the Minnesota Supreme Court held that the payor bank is entitled to presentment at its banking house; but that, if the payor bank designates a local clearinghouse member to receive its checks from clearings, presentment "at and through" the clearinghouse is presentment to the payor bank. In Farmers and Merchants Bank, the California court held presentment of a check to the Harbor-Orangewood branch of Bank of America  a bank separate from Bank of America under California law  occurred when a messenger delivered the check for processing for Harbor-Orangewood at Bank of America's Montebello computer center, located apart from the involved banking houses. Because it was unnecessary to the decision, the court assumed without deciding the trial court correctly ruled presentment had not previously occurred at Bank of America's separate Southwest Erma computer center, where the check was first taken in a batch for sorting. The court found the Montebello computer center performed functions antecedent to final payment or dishonor which previously were manually performed on presentment by employees at the payor's banking house. Consequently  to use the characterization by Lewis' expert witness of similar functions in Lewis' data processing department  the Montebello computer center received presentment because it began the process of determining whether to pay or dishonor Harbor-Orangewood's check.
In the circumstances of this case, the Commonwealth check delivered by the Tallahassee clearinghouse to Lewis State Bank Data Processing Center on June 20 was thereby presented to Florida State for payment. Presentment was not there delayed by the need for sorting the check from mixed batches of checks drawn on Florida State, Lewis and Gulf National. Put another way, we reject as a matter of law the distinction urged by Lewis between its proof and transit and data processing departments at the processing center. Three considerations lead us to this result:
First, the data processing contract between Florida State and Lewis contemplated Florida State would deliver its checks and other "input data" to Lewis at Lewis' *1035 "banking house," without distinguishing between Lewis' separate buildings or between separate departments within the same building. Although the contract did not employ the term "presentment," it was pursuant to that contract that Lewis concedes and the evidence shows presentment did occur when the check began final processing for payment or dishonor. The contract required Florida State to deliver input items, including checks, in orderly batches. That requirement was not fulfilled, for Florida State's checks were not segregated from those of Lewis and Gulf National by Capital City, which was not requested to do so, nor by the clearinghouse or Florida State. Sorting was therefore necessary at Lewis' processing center, and Lewis by contract retained the option of providing such extra services to make Florida State's items "machine processable" at extra expense to Florida State. The necessity for sorting  at Lewis' choice, done in its proof and transit rather than its data processing department  did not modify or divide the contract's singular purpose: the performance by Lewis, for a fee, of functions which in law constitute presentment of Florida State's checks.
Second, though we need not decide whether presentment occurs at the receiving and sorting facility of an agent for presentment which must forward items to its remote data processing center for presentment functions, as in Farmers and Merchants Bank, we cannot accept Lewis' distinction between separate departments within its single computer center. Granting that a payor bank may reserve entirely to itself the selection of a place for presentment other than its banking house, § 674.204(3), F.S. 1973, Florida State's contract for data processing services and its vicarious participation in the clearinghouse arrangement constituted designation of Lewis State Bank as the place for presentment of Florida State checks processed through the clearinghouse. It explicitly designated "Lewis State Bank Data Processing Center" as the place for presentment of checks in process of collection through Federal Reserve Bank of Jacksonville. In neither its Federal Reserve contract nor its instructions to the clearinghouse did Florida State specify presentment to Lewis' data processing department, as contrasted with its proof and transit department.
And third, Lewis' attempted distinction between its departments at the center would cancel the Code's provision for presentment "[t]hrough a clearinghouse," § 673.504(2)(b), F.S. 1973, and the consistent purpose of the Tallahassee clearinghouse since before 1928. Though not a signatory to the clearinghouse agreement, Florida State elected to participate through Lewis and so became privy to it. Geibe, supra, 160 Minn. at 94, 199 N.W. at 516.[4] Presentment was the immediate, not the remote, object of that arrangement. In earlier days, when Tallahassee bankers met and exchanged checks across a table, that was considered presentment; when later they designated Barnett Bank of Tallahassee to receive, provisionally settle and deliver checks to payor banks, proper delivery of checks was considered presentment; and now, when the clearinghouse has been asked by nonsignatory banks to provisionally settle their checks and deliver them for processing to participant banks having computer capacity, that delivery too is presentment. If Lewis' arrangements with multiple payor banks make sorting necessary by depositary banks, by the clearinghouse, or by Lewis at the place for presentment, that is a matter for the banks to regulate by custom or agreement; but delivery of Florida State's checks to Lewis is nevertheless presentment at the place designated by Florida State.
We therefore hold as a matter of law that delivery of the first Commonwealth check by the clearinghouse to Lewis on June 20 constituted presentment to Florida State; that delivery of the second Commonwealth *1036 check on June 21 likewise constituted presentment; and that, regardless of the number or complexity of steps taken by Lewis to make Florida State's checks machine processable for the decision to pay or dishonor, Florida State was obliged by §§ 674.212(2), 674.213 and 674.301, F.S. 1973, to dishonor the checks before midnight of the banking day following presentment or be held "accountable for the amount of the item." Section 674.213(1)(d), F.S. 1973. Florida State having failed to dishonor the Commonwealth checks within the time allowed after presentment, its attempt thereafter to dishonor was ineffective as to Capital City, which therefore is not liable to Lewis.
The case will be remanded for entry of judgment for Capital City.
REVERSED.
MILLS, Acting C.J., and MELVIN, WOODROW M., Associate Judge, concur.
NOTES
[1] Sec. 674.212(2), F.S. 1973, in relevant part states: "Within the time and manner prescribed ..., an intermediary or payor bank, as the case may be, may return an unpaid item directly to the depositary bank and may send for collection a draft on the depositary bank and obtain reimbursement."
[2] Part of Lewis' demonstration that its proof and transit department acted separately from data processing as a collecting bank was its expert's opinion that proof and transit "granted" Capital City provisional credit and "proved" the sum of the items against the sum claimed in the machine tapes and settlement sheet. But Lewis "granted" Capital City provisional credit only by its standing order to Barnett Bank of Jacksonville to honor instructions by the clearinghouse, Barnett Bank of Tallahassee, for provisional settlements of the items cleared. There is evidence Lewis' proof and transit department "proved" the balances on the settlement sheet sent by the clearinghouse, but no evidence that proof and transit, acting separately or as an integral Lewis department, had anything to do with "granting" Capital City provisional credit for the checks cleared to Lewis.
[3] Lewis' banking expert acknowledged that presentment may be designated to occur, and may occur, somewhere other than the place where both the necessary information and the ultimate authority to pay coalesce. He testified: "And then they [proof and transit] had to forward the items to someone who had the information and authority to begin the process of making a determination of whether or not an item should be paid or returned. And I believe that ... data processing basically begins that process" (emphasis added). Presumably the witness adverted to circumstances in which the computer had nearly all the information and all but the ultimate authority to return a check drawn on a nonexistent, closed or overdrawn account, or to pay an apparently regular check drawn on an account shown by computer information to be adequate. This record does not inform us whether Lewis' computer could inform any one at data processing on June 21 that the Commonwealth check was drawn on "uncollected funds."
[4] "When, by arrangement with a member bank, an outside bank gains admission to the clearing house, the member bank becomes its agent, and its rights and liabilities should be determined by applying the principles of the law of agency."