[Civ. No. 68525. Second Dist., Div. Five. Oct. 12, 1983.]

NAUTILUS LEASING SERVICES, INC., Plaintiff and Respondent, v. CROCKER NATIONAL BANK, Defendant and Appellant.

COUNSEL

Girvan Peck and Morrison & Foerster for Defendant and Appellant.

James H. Seymour and Seymour & Willis for Plaintiff and Respondent.

OPINION

**HASTINGS, J.**—This is an appeal from a summary judgment in favor of plaintiff and respondent Nautilus Leasing Services, Inc. (Nautilus). The cross-motion for summary judgment by defendant and appellant Crocker National Bank (Crocker) was denied. The facts in this case are not in dispute, the parties having agreed below that resolution of the issues of law by summary judgment was appropriate.

The appeal concerns a check in the amount of $35,948, issued to Nautilus by States Steamship Company (States) and drawn on States' account with Crocker. By virtue of a setoff exercised by Crocker against the States account, the account was overdrawn and the check was returned to Nautilus unpaid.

The check, dated November 28, 1978, was deposited by Nautilus in its account at the Chartered Bank of London, which forwarded the check to Crocker through the San Francisco Clearinghouse Exchange.

The check was received at the Crocker operations center (item processing department) at approximately 8 a.m. on Friday, December 1, 1978. This department processes checks through an IBM Reader/Sorter machine, which sorts checks according to branch (by "reading" the numbers encoded on the check) and stamps "paid" on the reverse of each check. The "paid" stamp is affixed to all incoming checks, whether or not there are sufficient funds in the customer's account.

The item processing department also machine-posts each check to the appropriate account. The States check payable to Nautilus was posted to States' account at approximately 2 a.m. on Saturday, December 2, 1978. Checks are posted whether or not the account contains sufficient funds to cover the check. States' bank statement shows the date "December 1, 1978" next to the check because (as explained by Crocker) the check was "received and provisionally settled for" on that date.

On Monday, December 4, 1978, the checks processed by item processing on the previous Saturday were sent to the appropriate Crocker branches. Because of the large number of checks drawn on the States account and because States utilized Crocker's specialized corporate management services, States' "branch" was Crocker's account reconcilement department. This department kept all records, filed checks, rendered statements, processed stop payment orders and handled all other transactions related to the States account.

At the time the check was presented for payment, States was indebted to Crocker in the approximate sum of $2 million. The loan was secured by States' checking account with Crocker and other States assets. The loan was payable upon demand. During the latter part of 1978, States was in severe financial difficulty and was conducting merger negotiations with another steamship line in an effort to improve its financial situation. Crocker knew of States' financial problems and considered (almost on a daily basis) making demand for payment of the loan. Crocker held off making demand, however, pending the outcome of the merger negotiations. Raymond Donohue, States' secretary/treasurer, had agreed to inform Crocker by December 4, 1978, whether the merger would go through.

On the morning of December 4, Donohue telephoned Crocker vice president Robert Walker and advised Walker that the merger discussions had terminated and the merger would not occur. Walker advised Donohue that States would receive a demand letter that morning. John Bulkeley, a Crocker vice president, delivered the letter to States and States indicated that it could not honor the demand. Walker directed the account reconcilement

department to set off the States account, and he informed Donohue of the setoff in another telephone conversation on the morning of December 4, The setoff, in the amount of $1,726,032.21, left the States account with a negative balance. The States check to Nautilus, and other checks which had been presented for payment from the States account, were returned unpaid.

At 2 p.m. on the afternoon of December 4, States filed a petition pursuant to chapter XI of the Bankruptcy Act. On December 12, States and Crocker filed a stipulation, approved by the bankruptcy court, that the setoff was valid, and States waived any right to challenge it.[1]

Resolution of the issues raised in this appeal involves the construction and application of California Uniform Commercial Code section 4303.[2] That section determines who wins the race for the funds in a depositor's account when an item has been presented for payment and the bank (1) receives knowledge or notice of legal process, (2) receives a stop order, or (3) decides to exercise a setoff against the account. A bank has the right to return a check unpaid provided none of the events listed in section 4303 have

---

[1]According to Nautilus, Crocker had returned a number of States' payroll checks unpaid, and States' agreement to waive any rights it might have to challenge the validity of the setoff was made in exchange for Crocker's promise to honor States' payroll checks, thereby avoiding a "mass resignation" by States' employees.

[2]Section 4303 provides as follows: "(1) Any knowledge, notice or stop order received by, legal process served upon or setoff exercised by a payor bank, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item or to charge its customer's account for the item, comes too late to so terminate, suspend or modify such right or duty if the knowledge, notice, stop order or legal process is received or served and the bank does not have a reasonable time to act thereon before, or the setoff is exercised after, the happening of any of the following:

"(a) The bank has accepted or certified the item;

"(b) The bank has paid the item in cash;

"(c) The bank has settled for the item without having a right to revoke the settlement under any of the following: statute, clearinghouse rule, agreement, or reservation thereof;

"(d) The cutoff hour (Section 4107) or the close of the banking day if no cutoff hour is fixed of the day on which the bank received the item;

"(e) The bank has become accountable for the amount of the item under subdivision (1) (d) of Section 4213 and Section 4302 dealing with the payor bank's responsibility for late return of items; or

"(f) The item has been deposited or received for deposit for credit in an account of a customer with the payor bank.

"(2) Subject to the provisions of subdivision (1) items may be accepted, paid, certified or charged to the indicated account of its customer in any order convenient to the bank and before or after its regular banking hours. A bank is under no obligation to determine the time of day an item is received and without liability may withhold the amount thereof pending a determination of the effect, consequence or priority of any knowledge, notice, stop order or legal process concerning the same, or interplead such amount and the claimants thereto."

Unless otherwise indicated, all further statutory references are to the California Uniform Commercial Code.

occurred. However, if any of these events *have* occurred, the knowledge, notice, stop order or setoff comes too late.

■ Generally, a drawee bank is not liable to a holder for failure to pay a check, because the check itself is not an assignment of the funds in the drawer's bank account. (Clark & Squillante, The Law of Bank Deposits, Collections and Credit Cards (1970) p. 57; § 3409.)[3] The payee's remedy is against the maker of the check, not against the payor bank. (Bailey, Brady on Bank Checks (5th ed. 1979) p. 18-6.) Citing this law, Crocker claims Nautilus has no standing to bring the action.

Nautilus addresses the standing issue by arguing that Crocker violated section 4303 and is therefore liable for damages proximately caused by the breach of its statutory duty, the damages being the amount of the check returned by Crocker. This presumes, of course, that Nautilus is within the class of persons which the statute seeks to benefit. Crocker argues that the payee of a check is not within this class, and that the bank is accountable only to the depositor.

We need not address the standing issue at all if Crocker's setoff was not precluded by any of the provisions of section 4303. We find that it was not, and therefore reverse the judgment.

Nautilus seeks to impose liability upon Crocker based upon the arguments that Crocker (1) "accepted" the check (§ 4303, subd. (1)(a)), and (2) retained the check beyond the permissible deadline (§ 4303, subd. (1)(d)).

I

■ Relying on *Rosen v. Rosen* (1936) 17 Cal.App.2d 601 [62 P.2d 384], Nautilus contends that Crocker "accepted" and thereby became accountable for the check. The facts of *Rosen* are as follows:

Elsie Rosen (formerly Elsie Traub) was married to Louis Rosen but had a separate property account in her maiden name at the Bank of America. After her marriage, she permitted Louis to make receipts and draw checks on the account in the conduct of his business.

---

[3]Section 3409 provides in pertinent part: "(1) A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it."

Elsie drew a check in the amount of $265 in favor of L. G. Koerner, which check arrived at Elsie's branch between 8:30 and 9:15 a.m. on May 7th. The check was then "run off on the adding machine, sorted alphabetically and checked for date, endorsement and genuineness of the signature of the drawer." (*Id.*, at p. 603.) Since the Bank of America operated a central "clearing house" for all of its Los Angeles branches, it was the bank's custom to make final postings in the evening after regular banking hours. Therefore, Elsie's check to Koerner was held in the branch bank, awaiting final posting at the end of the banking day.

About 12:15 p.m., the bank received a writ of execution against the account by Ethel (the former Mrs. Louis) Rosen, who was attempting to recover money owed to her by Louis. In a dispute over who was entitled to the funds in the account, Koerner prevailed over Ethel Rosen. The court held that final posting was not a prerequisite to fixing the liability of the bank, and the bank had "accepted" the check before the levy of execution. (*Ibid.*)[4]

The problem with Nautilus' substantial reliance on the *Rosen* case is the intervening passage of the Uniform Commercial Code. The code anticipates every need. It not only adopts the principle set forth in *Rosen* that a bank becomes accountable for an item when (among other things) it "accepts" the item, it has defined what is meant by "accept." The actions of Crocker here do not come within that definition. The Uniform Commercial Code commentators tell us that "acceptance," within the meaning of section 4303, subdivision (1)(a), means "formal acceptance as that term is used and defined in Section 3-410." (Cal. U. Com. Code, comment 2 to § 4303.) Section 3-410 specifies that "[a]cceptance is the drawee's signed engagement to honor the draft as presented. It must be written on the draft, and may consist of his signature alone. It becomes operative when completed by delivery or notification." According to Crocker, section 3410 requires that in order for Crocker to have "accepted" the check, it must have been "signed, and signed intentionally by an authorized bank official on the check itself." This is not to suggest that bank officers must sign every check that comes into the bank. However, "acceptance," within the meaning of sections 4303 and 3410, requires a certain degree of formality, and that formality is lacking here.

Nautilus suggests that the "signature" requirement was satisfied when Crocker affixed a "paid" stamp to the check. Nautilus argues that "[i]f any

---

[4]As it turned out, Ethel received nothing for her trouble, since the funds remaining in the account were found to be the separate property of Elsie.

other meaning were intended, Crocker would have used 'RECEIVED' or some other word more descriptive of an intent other than payment." Nautilus goes on to say that "Crocker must accept the liabilities of machines, *i.e.,* that they affix signatures if it receives the benefits of their use." (*Sic.*) However, the mere act of stamping a check "paid" does not constitute final payment of the check. "The use of such stamps and other internal procedures constitute 'mere memoranda adopted in aid of the convenient dispatch of business.'" (*Pupko* v. *Bank of America* (1980) 114 Cal.App.3d 495, 500 [170 Cal.Rptr. 615], citing *Ocean Park Bank* v. *Rogers* (1907) 6 Cal.App. 678 [92 P. 679].) Nor is the fact that the check was posted to the States account determinative. In fact, the rule of Uniform Commercial Code section 4-213, subdivision (c) that an item is "finally paid" by a payor bank when the bank has "completed the process of posting the item to the indicated account" was rejected in California, which deleted subdivision (c) because California banks have centralized bookkeeping systems. (Cal. U. Com. Code, comment 8 to § 4213.)[5]

## II

Since the actions of Crocker here are not sufficient to invoke section 4303, subdivision (1)(a) ("acceptance" of the check), the issue is whether liability may be imposed upon Crocker by virtue of its *failure* to act. Put another way, did Crocker hold the check too long prior to exercising the setoff?

Section 4303, subdivision (1)(d) provides that the exercise of a setoff comes too late if it is done after "[t]he cutoff hour (Section 4107) or the close of the banking day if no cutoff hour is fixed of the day on which the bank received the item."[6] Nautilus claims that Crocker "received" the

---

[5]The following excerpt from comment 8 is noteworthy: "Paragraph (c) of subdivision (1) is omitted because California banks have centralized bookkeeping systems:

"'The proposed deletion of clause (c) of the original subsection [subdivision] is suggested in the light of the practice of California banks of having centralized bookkeeping systems where items are posted first and thereafter sent to the proper branch for checking of signatures, stop payments, and the like. If clause (c) were retained in its present form the unfortunate consequences would be that an item would be considered to be finally paid by a bank before the signature had been verified. This raises the question whether to amend clause (c) to provide that an item is not finally paid until verified and posted or whether it is best to delete it. California bankers and bank lawyers believe it should be deleted because of the uncertainty and indefiniteness of relating "payment" to the procedures of bookkeeping systems, whether mechanical or manual. They prefer to relate "payment" to failure to revoke within the time allotted by statute, clearinghouse rule or agreement.' Marsh and Warren Report, Sixth Progress Report to the Legislature by Senate Fact Finding Committee on Judiciary (1959-1961) Part 1, The Uniform Commercial Code, p. 476."

[6]Section 4107 provides in pertinent part that "a bank may fix an afternoon hour of 2 p.m. or later as a cutoff hour for the handling of money and items and the making of entries on its books."

check on December 1 (Friday) and was thus obligated to return it by the end of that day or become liable for payment. Crocker claims that it did not "receive" the check until December 2 (Saturday), the day the check arrived at States' "branch" bank. Since Saturday was not an official banking day, and Crocker exercised the setoff before the end of the next banking day (Monday the 4th), the setoff was timely.

Nautilus cites *Farmers & Merchants Bank* v. *Bank of America* (1971) 20 Cal.App.3d 939 [98 Cal.Rptr. 381], a case decided under the relatively simple provisions of the California Financial Code in effect prior to adoption of the Uniform Commercial Code. Under Financial Code section 1013, a bank had until midnight of its next business day after receipt within which to dishonor or refuse payment of an item. The issue in the *Farmers & Merchants* case was whether the Bank of America's Montebello computer center and its Harbor-Orangewood branch bank were one and the same for purposes of determining when a check had been received. The court held that the checks in question were "received" when they arrived at the computer center, since the center performed bookkeeping functions formerly performed at the branch. (*Id.*, at p. 944.)

As Crocker points out in its reply brief, the *Farmers & Merchants* does not really help Nautilus, and in fact aids Crocker. The court distinguished the Montebello computer center, which performed bookkeeping functions, from the bank's "Erma" computer, which performed essentially the same functions as Crocker's item processing department: sorting and routing checks. The court accepted the trial court's theory that receipt by the "Erma" computer did not constitute receipt by the branch. (*Id.*, at p. 944, fn. 3.) This disposes of Nautilus' argument that the check was received by Crocker on December 1. Under the *Farmers & Merchants* case, Crocker is deemed to have received the check on December 2 (Saturday), when it was not open for business. The bank exercised its setoff before the end of the next banking day (Monday the 4th) and therefore the setoff was timely.

Crocker also points to section 4303, subdivision (1)(c), which permits a bank to exercise a setoff before "[t]he bank has settled for the item without having a right to revoke the settlement under any of the following: statute, clearinghouse rule, agreement, or reservation thereof." According to Crocker, it had a right to revoke its "provisional settlement" under sections 4301 and 4302. Section 4302, subdivision (a) provides that a bank is accountable for the amount of an item if it "does not pay or return the item or send notice of dishonor until after its midnight deadline." Section 4104, subdivision (h) defines "midnight deadline" as "midnight on its next banking day following the banking day on which it receives the relevant

item. . . ." Under these sections, Crocker's deadline (regardless of whether the check was received on Friday the 1st or Saturday the 2d) was midnight on Monday, December 4, and the setoff was exercised prior to that time.

Nautilus finally contends that Crocker is liable in tort under the theory of conversion. This argument assumes that Nautilus had a claim to the funds allegedly "converted." For the reasons stated it did not, so this argument obviously fails.

The judgment is reversed and remanded to the trial court with instructions to issue a new judgment for Crocker on its cross-motion for summary judgment.

Feinerman, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied November 9, 1983, and the opinion was modified to read as printed above.