584 P.2d 1242

IDAH–BEST, INC., Plaintiff-Respondent,

v.

FIRST SECURITY BANK OF IDAHO, N.A., HAILEY BRANCH, Defendant-Appellant.

No. 12712.

Supreme Court of Idaho.

Oct. 4, 1978.

Stephen W. Boller, Hailey, Richard E. Hall of Moffatt, Thomas, Barrett & Blanton, Boise, for defendant-appellant.

Paul M. Beeks of Smith & Beeks, Twin Falls, for plaintiff-respondent.

McFADDEN, Justice.

Plaintiff-respondent Idah-Best, Inc. filed this action against the Hailey branch of the First Security Bank of Idaho, N.A., hereinafter appellant. Appellant had dishonored a check drawn on itself and payable to respondent. In its complaint, respondent alleged that appellant had failed to return the dishonored check or give notice of dishonor within its "midnight deadline." Respondent prayed for judgment in the amount of the check, as provided by I.C. § 28–4–302,[1] as well as costs and attorney fees. Respondent subsequently moved for summary judgment, which was granted. In a document styled a "partial summary judgment" the court ruled that appellant had indeed failed to meet its midnight deadline and was therefore liable for the amount of the check ($30,000) plus interest. The "partial summary judgment" also calculated the interest on the amount of the check and further ordered "that the question of attorneys fees and of costs of suit be deferred until trial on other proceeding in this action." Upon appellant's motion, the court granted a "stay of execution" of the

---

1. I.C. § 28–4–302 provides:

28–4–302. Payor bank's responsibility for late return of item.—In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of section 28–4–207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of

  (a) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or

  (b) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents.

"partial summary judgment" pending reconsideration. Subsequently the court denied the motion to reconsider and "vacated" the "stay of execution." It is from this "partial summary judgment" that appellant appealed. The parties later stipulated that the orders of the trial court regarding costs and attorney fees should be made a part of the appeal record but no action was taken to add these orders to the record.

## ISSUE OF APPEALABILITY

The threshold issue in this appeal is whether the court has before it an appealable judgment or order. This court has repeatedly stated that although art. 5, § 9, of the Idaho Constitution gives this court jurisdiction to review "any decision of the district courts," "the phrase 'any decision' does not mean all decisions made by said courts or the judges thereof during the progress of a trial, but only such as are final or such as are specifically provided for by statute . . . ." *Weiser Irrig. Dist. v. Middle Valley Irrig. Ditch Co.*, 28 Idaho 548, 553, 155 P. 484, 486 (1916). *See Pulver v. State*, 92 Idaho 627, 448 P.2d 241 (1968); *Farmers Equip. Co. v. Clinger*, 70 Idaho 501, 222 P.2d 1077 (1950). Rule 11 of the Idaho Appellate Rules provides that appeals to this court may be taken:

From the following judgments and orders of a district court in a civil action:

1. Final judgments and decrees including decisions by the district court dismissing, affirming, or reversing or remanding an appeal.

2. Judgments made pursuant to a partial summary judgment certified by the trial court to be final as provided by Rule 54(b), I.R.C.P.

3. An order granting or refusing a new trial.

4. An order granting or denying a motion for judgment notwithstanding the verdict.

5. Any order made after final judgment.

Under the circumstances of the instant case, this court finds that in order for the "partial summary judgment" to be appealable, it must come within I.A.R. 11's provisions allowing appeals either from "final judgments" or from "[j]udgments made pursuant to a partial summary judgment certified by the trial court to be final as provided by Rule 54(b), I.R.C.P."

The record shows no certification of the "partial summary judgment" pursuant to I.R.C.P. 54(b). Therefore the "partial summary judgment" must be a final judgment if this court is to exercise appellate jurisdiction.

"Whether an instrument is an appealable order or judgment must be determined by its content and substance, and not by its title." *Howell v. Reimann*, 77 Idaho 84, 87, 288 P.2d 649, 651 (1955); *State v. McNichols*, 62 Idaho 616, 115 P.2d 104 (1941); *Swinehart v. Turner*, 36 Idaho 450, 211 P. 558 (1922). Thus if the instrument "ends the suit," *Farmers Equipment Co. v. Clinger, supra*, "adjudicate[s] the subject matter of the controversy," *Doolittle v. Morley*, 76 Idaho 138, 140, 278 P.2d 998, 999 (1955), and represents a "final determination of the rights of the parties," *Pulver v. State*, 92 Idaho 627, 628, 448 P.2d 241, 242 (1968) (citing former I.C. § 10–701), the instrument constitutes a final judgment regardless of its title. *See Southland Produce Co. v. Belson*, 96 Idaho 776, 536 P.2d 1126 (1975); *Viani v. Aetna Ins. Co.*, 95 Idaho 22, 501 P.2d 706 (1972); *Gerry v. Johnston*, 85 Idaho 226, 378 P.2d 198 (1963); *Lamberton v. McCarthy*, 30 Idaho 707, 168 P. 11 (1917); *Evans State Bank v. Skeen*, 30 Idaho 703, 167 P. 1165 (1917).

This court's examination of a somewhat confused record shows that the "partial summary judgment" was intended as a final judgment. The partial summary judgment disposed of the substantive issues, leaving for determination only the issue of "attorneys fees and costs of suit." It is significant that the "partial summary judgment" not only determines that appellant is liable on the dishonored check and establishes the amount of the damages, but it also calculates interest on the amount of the liability. If the court has truly granted a partial summary judgment it would not

have calculated interest until entry of a subsequent final judgment. *See State ex rel. Symms v. Collier*, 93 Idaho 19, 454 P.2d 56 (1969); *Elliot v. Elliot*, 88 Idaho 81, 396 P.2d 719 (1964). Furthermore, if the "partial summary judgment" were only that, the court would not have granted a "stay of execution" pending a ruling on the motion to reconsider the decision; there can be no execution on a money judgment not yet final. Nor did respondent act in any way inconsistent with the finality of the "partial summary judgment." Following the filing of the notice of appeal, respondent joined appellant in a stipulation waiving supersedeas bond—a stipulation that referred to appellant's "appeal [from] the Partial Summary Judgment." Under these circumstances, the court holds that the "partial summary judgment" was intended to be and is a final judgment that anticipated subsequent determination of costs by the trial court. *Dolbeer v. Harten*, 91 Idaho 141, 148, 417 P.2d 407, 414 (1966) (dicta). There being a final judgment, the case is appealable to this court under I.A.R. 11 and will be decided on its merits.

## MERITS

### A. *The Facts*

The check giving rise to this action was dated[2] Friday, October 31, 1975, drawn by Wesley Prouty doing business as Fox Acres, on appellant Hailey branch, First Security Bank of Idaho, N.A., and issued to the named payee, respondent Idah-Best, Inc. on that date in Twin Falls, Idaho. Also on Friday, October 31, respondent deposited the check in its account with Twin Falls Bank & Trust Company, obtaining a provisional credit in its account. I.C. § 28–4–201 (provisional settlement). Nothing further occurred on Saturday, November 1, and Sunday, November 2, during which time Twin Falls Bank & Trust was closed. *See* I.C. § 26–1002 (prohibiting banking on Saturdays and legal holidays); I.C. § 73–108 (proclaiming every Sunday a legal holiday). The bank being closed on these days, they

were not "banking days." I.C. § 28–4–104(1)(c).

On Monday, November 3, Twin Falls Bank & Trust, acting as respondent's agent for collection, I.C. § 28–4–201, mailed respondent's check, as well as others drawn on First Security branches in southwestern Idaho, to the Boise branch of First Security Bank for deposit in Twin Falls Bank & Trust's commercial account there. This commercial account is maintained by Twin Falls Bank & Trust for the purpose of clearing between it and southwestern Idaho First Security branches checks drawn on each other.

Respondent's check arrived at the Boise branch the next day, Tuesday, November 4, in the batch of checks from Twin Falls Bank & Trust. The batch was sent to the data processing center in the basement of the Boise branch where the total amount of the batch and the accompanying "cash letter" were reconciled. Twin Falls Bank & Trust was then given a provisional credit in its Boise branch account for the amount of the "cash letter." The checks were then indorsed by the Boise branch by stamping on the back the customary bank indorsement with the Boise branch's number.

Next, the batch of checks was sorted according to the particular first Security branch upon which each was drawn. The amount of each check was then encoded upon each check in magnetic ink. During the nighttime, the encoded information, which included the bank and account numbers, was recorded on a magnetic disc, which in turn was transmitted by telephone line to First Security Bank's Salt Lake City, Utah, computer, which contains all accounts in all First Security banks. Using the transmitted data, the Salt Lake City computer posted the amounts of the individual checks to the particular accounts. The computer also adjusted the account balances between the Boise branch and the other branches upon which checks were drawn, giving the Boise branch provisional

---

**2.** Although no testimony was received as to the actual date of issue, I.C. § 28–3–114(3) provides that where an instrument is dated, the date is presumed to be the correct date of issue.

credits for the checks drawn on each respective branch's accounts. Again by telephone line, the Salt Lake City computer transmitted to Boise new balances in all affected accounts in all southwestern Idaho branches. This information was printed at the Boise data processing center for distribution to all branches. The Salt Lake City computer also transmitted to Boise a list of checks for which the computer found insufficient funds, closed accounts or incorrect account numbers. This entire process was completed in time for delivery of the processed checks to Bankers Dispatch[3] by 8:00 a.m. of the next morning.

On the list of checks drawn on appellant Hailey branch for which the computer found insufficient funds during the nighttime of November 4 was the check payable to respondent. For this check (as well as all other insufficient funds checks) the processing center then partially completed a "return check notice," a triplicate form addressed to the drawer of the check advising him of the check's dishonor. All checks drawn on the Hailey branch were then assembled according to account number. Early in the morning of Wednesday, November 5, the batch of checks was sent to Hailey by Bankers Dispatch, accompanied by the list of insufficient funds checks, the partially completed return check notices and other papers.[4]

The Hailey branch received the batch of checks containing respondent's check on Wednesday, November 5, the same day it was sent from Boise. All the checks were proofed to determine the validity of the signatures. The checks found to be genuine and drawn on sufficient funds were stamped paid and filed in the customer's file drawer. Insufficient funds checks were also checked for validity and then circulated among tellers to determine whether there had been any recent deposit that might cover the check. Even if no deposit had been made to cover a particular check, still the check was circulated among branch officers, who could approve payment despite insufficient funds. In the case of respondent's check, no covering deposit was found. The branch manager decided the following day, November 6, to refuse payment. The check was stamped "refer to maker" for the check to be returned to the last indorser, the Boise branch.

Also on Thursday, November 6, the Hailey branch prepared an internal office clearings letter. This clearings letter, when received by the Boise branch with the accompanying dishonored check and processed, had the effect of reversing the provisional credit given the Boise branch and the provisional debit given the Hailey branch. The Boise branch received the internal office clearings letter along with the returned checks on Friday, November 7,[5] and apparently these inter-branch account entries were made on that date.

On Monday, November 10, the Boise branch debited Twin Falls Bank & Trust's account there for the amount of respondent's $30,000 check (as well as several other insufficient funds checks) and dispatched the check to Twin Falls Bank & Trust.

The next day, November 11, was Veteran's Day, a legal holiday, I.C. § 73–108, on

3. Bankers Dispatch is the bank messenger service that delivers (by automobile) checks, account updates and other papers to First Security branches.

4. At this time the Boise branch had received provisional credit to its account for the checks forwarded to the Hailey branch. See I.C. § 28–4–211. Under the midnight deadline rule, I.C. § 28–4–104(1)(h), the Hailey branch was obligated to dishonor the check by midnight of November 6, the day following receipt.

5. The record contains some indications that these returned checks were actually received late on the afternoon of November 6. However, I.C. § 28–4–107 provides that "For the purpose of allowing time to process items, prove balances and make the necessary entries on its books to determine its position for the day, a bank may fix an afternoon hour of two (2) p.m. or later as a cut-off hour for the handling of money and items and the making of entries on its books." Any item received after this hour may be treated as having been received at the opening of the next banking day. There is nothing in the record to indicate whether the Boise branch has designated such a cut-off time other than 2:00 p.m.

which banks are not permitted to be open for business, I.C. § 26–1002. On November 12, Twin Falls Bank & Trust received respondent's check from the Boise branch of First Security Bank. On November 13, it sent notice of dishonor to respondent, which received it on November 14, more than two weeks after deposit.

## B. *Proceedings in District Court*

In its complaint, respondent alleged that appellant Hailey branch "received said check on *November 4, 1975,* but did not pay or settle for said check or give notice of dishonor thereof for more than five (5) days after the receipt thereof." (Emphasis supplied.) Respondent moved for summary judgment and urged the following theory in support of the proposition that the check was received by the Hailey branch and not returned for more than five days thereafter, thus making the Hailey branch liable for its face amount. Respondent's check is an "item," that is, an "instrument for the payment of money." I.C. § 28–4–104. "[A] bank by which an item is payable as drawn or accepted" is a "payor bank." I.C. § 28–4–105. Because respondent's check was drawn on appellant Hailey branch and intended to be paid with funds of the drawer in his account there, *Whitehall Packing Co. v. First National City Bank,* 55 A.D.2d 675, 390 N.Y.S.2d 189 (1976), the Hailey branch was the payor bank of respondent's check. Under I.C. § 28–4–302, "[I]f an item is presented on and received by a payor bank the bank is accountable for the amount of . . . a demand item . . . if the bank . . . retains the item beyond midnight of the banking day of receipt without settling for it or, . . . does not pay or return the item or send notice of dishonor until after its midnight deadline . . .," that is, after "midnight of [the bank's] next banking day following the banking day on which it receives the relevant item . . ." I.C. § 28–4–104. "Accountable for" means liable for the face amount of the check. *National City Bank of Rome v. Motor Contract Co. of Rome,* 105 Ga.App. 498, 166 S.E.2d 742 (1969); *Rock Island Auction Sales, Inc. v. Empire*

*Packing Co.,* 32 Ill.2d 269, 204 N.E.2d 721 (1965); *Leaderbrand v. Central State Bank of Wichita,* 202 Kan. 450, 450 P.2d 1 (1969); *Farmers Cooperative Livestock Market, Inc. v. Second National Bank of London,* 427 S.W.2d 247 (Ky.1968); *Sun River Cattle Co. v. Miners Bank of Montana, N.A.,* 164 Mont. 237, 521 P.2d 679 (1974).

Respondent argued that because the Boise data processing center performs for appellant the bookkeeping functions required of a payor bank, the center is part of the Hailey branch. Thus under respondent's theory, the check was "presented to and received by" appellant Hailey branch when it arrived at the data processing center on November 4. Because the check was not returned nor notice of dishonor sent by midnight of November 5, appellant exceeded the midnight deadline and became liable for the face amount of the check.

The district court accepted this theory. In its "decision" the court stated:

> In this case, the computer in Boise does the bookkeeping for the Hailey Branch. The Hailey Branch simply confirms or rejects the computer report. The computer cannot be defined [as] a separate bank; therefore, it must be a part of each branch bank it serves.

On this basis the trial court ruled that appellant Hailey branch's midnight deadline must be calculated from the time the Boise data processing center received the check— that is, November 4—and that by failing to return respondent's check until several days later, appellant had indeed missed its midnight deadline. The trial court granted respondent's motion for summary judgment.

There appearing no genuine issue as to any material fact, the controlling question is whether respondent was "entitled to a judgment as a matter of law." I.R.C.P. 56(c). The legal issue—and the point upon which respondent's case stands or falls—is whether the district court erred in ruling that, for purposes of I.C. § 28–4–302, the arrival of respondent's check at First Security Bank's data processing center constituted "presentment upon" and "receipt by"

appellant Hailey branch so that the time for appellant's midnight deadline began to run from the time of its arrival at the data processing center in Boise.

## C. *Legal Conclusion*

■ In this opinion this court has at some length explained the progress of respondent's check from its initial deposit in Twin Falls Bank & Trust until its return some fourteen days later. The court has had to consider the detailed steps in the check collection process in order to apply them to the facts as presented to the district court on the motion for summary judgment. This court has also been mindful that on a summary judgment motion the party opposing the motion must be given the benefit of any favorable inferences that might reasonably be drawn from the evidence. *Farmer's Ins. Co. of Idaho v. Brown*, 97 Idaho 380, 544 P.2d 1150 (1976); *Straley v. Idaho Nuclear Corp.*, 94 Idaho 917, 500 P.2d 218 (1972); *Rawlings v. Layne & Bowler Pump Co.*, 93 Idaho 496, 465 P.2d 107 (1970). In light of the evidence in the record and such favorable inferences, it is the conclusion of this court that the district court erred in its ruling that receipt by the Boise data processing center of respondent's check was presentment upon and receipt by appellant Hailey branch for purposes of I.C. § 28–4–302. Although the data processing center performs some of the routine accounting steps for both the Boise branch and the Hailey branch, this does not destroy the essential character of the transaction: that the Boise branch acted as a collecting and presenting bank for an item only the Hailey office could pay. Furthermore, the legislature has expressly stated in I.C. § 28–4–106[6] its intent that the separateness of branch banks be respected in computing the midnight deadline, even where some of the branch's duties are performed outside the branch.

When respondent accepted the check that is the basis of the instant case, it was left with the decision as to how to obtain payment on the check. One method available to respondent was to present the check across the counter at the Hailey branch of First Security Bank. By depositing the check in its Twin Falls Bank & Trust Account, however, respondent chose a second alternative: to obtain payment through the bank collection process. To do this, respondent impliedly appointed Twin Falls Bank & Trust its agent to obtain payment by whatever reasonable method Twin Falls Bank & Trust chose. I.C. § 28–4–201.

In exercising its discretion to choose an appropriate means of collecting respondent's check, Twin Falls Bank & Trust was bound to adhere to the following standard of care:

> A collecting bank must send items by [a] reasonably prompt method taking into consideration any relevant instructions, the nature of the item, the number of such items on hand, and the cost of collection involved and the method generally used by it or others to present such items.

I.C. § 28–4–204(1). After weighing these considerations, Twin Falls Bank & Trust could send the check directly to the payor bank, I.C. § 28–4–204(2)(a)—that is, the bank named on the instrument and by which the check is payable, I.C. § 28–4–105 —or to an intermediary collecting bank for subsequent presentment to the payor bank. Rather than sending respondent's check to the Hailey branch, the named payor, Twin Falls Bank & Trust negotiated the check to the Boise branch of First Security Bank for immediate provisional credit in a commercial account Twin Falls Bank & Trust maintains there. I.C. § 28–3–202 (Negotiation). The record shows that it is the customary practice of Twin Falls Bank & Trust to deposit in this account checks drawn on twenty-three First Security branches in

---

6. Idaho Code § 28–4–106 provides:
Separate office of a bank.—A branch or separate office of a bank is a separate bank for the purpose of computing the time within which

and determining the place at or to which action may be taken or notices or orders shall be given under this chapter and under chapter 3.

southwestern Idaho.[7] This arrangement allows Twin Falls Bank & Trust to simplify its collection procedure for checks drawn on these twenty-three branch banks and to gain an immediate provisional credit rather than waiting for actual payment.

When the batch of checks containing respondent's check arrived at the Boise branch from Twin Falls Bank & Trust, it was immediately sent to the data processing center, then in the same building. It was to this receipt by the data processing center that the district court applied the legal characterization of "presentment upon" and "receipt by" appellant Hailey branch. An analysis of the operations of the Boise data processing center shows that its functions are limited to the sorting and indorsing process typical of a collecting bank and to the transmitting of information that allows the Salt Lake City computer to keep tentative customer accounts. It is the conclusion of this court that when considered in light of the entire collection and payments process, a check's arrival at the data processing center cannot be characterized as "presentment upon" and "receipt by" the Hailey branch.

The court first notes that it is characteristic of a collecting bank to indorse arriving checks, sort them according to the banks upon which they are drawn and, increasingly more frequently, to encode the amount of the check onto the check in magnetic ink. J. O'Brien, The Impact of Computers on Banking, at 43 (1968). A collecting bank also prepares the checks for physical delivery to the banks upon which they are drawn and dispatches them. When these acts are performed for the Boise branch at the data processing center, the Boise branch is truly acting as a collecting bank.

Nevertheless, the data processing center performs a function beyond those of a collecting bank. The center is the "capture site" and transmission point for data used by First Security's Salt Lake City computer to update customer and interbranch accounts. In performing this function, the data processing center performs one of the steps employed by a payor bank in recording payment of a check. The heart of this appeal is the question of whether the performance of this step in some way indicates that the process of paying a check and recording payment—that is, the functions of a payor bank—have been initiated.

The payor bank's duties begin when it receives presentment. "Presentment is a demand for acceptance or payment made upon the maker, acceptor, drawee or other payor by or on behalf of the holder." I.C. § 28–3–504. Presentment must be made to the payor or to one authorized to make or refuse acceptance or payment. I.C. § 28–3–504. Furthermore, I.C. § 26–1017 provides that:

> All checks . . . drawn against any banking corporation . . . operating branch banks . . . , *shall indicate the particular branch or office* at which the same are to be *presented for payment or acceptance.* If no particular office or branch is so indicated, such instruments, although otherwise entitled to payment and/or acceptance, need not be accepted or paid, and if the particular office or branch is so indicated, and such instruments are otherwise entitled to payment or acceptance, they shall be entitled to be paid or accepted only on due presentation at the particular branch or office so indicated.

(Emphasis added.) In the instant case, the Hailey office of First Security Bank is the branch named on respondent's check. In addition, no action on the part of Twin Falls Bank & Trust can be characterized as a presentment to either the Boise branch or the data processing center. Even if such a demand for payment were made on the processing center, it could not have been

---

7. The record does not disclose with any specificity the arrangements between Twin Falls Bank & Trust and First Security Bank for clearing each other's checks. Nor does the record disclose the extent of Twin Falls Bank & Trust's knowledge of the internal operating procedures of the Boise branch and the data processing center. In this action respondent does not challenge Twin Falls Bank & Trust's choice of collection method as being unduly circuitous or not a "reasonably prompt method" of collection.

accepted. First, there is nothing in the record that might show the processing center has authority to receive presentment under I.C. § 28–4–204(3), which provides that presentment may be made by a presenting bank at any place, presumably including an off-premises data processing center, where the payor bank requests presentment be made. I.C. § 28–4–204, Comment 4; *Capital City First Nat'l Bank v. Lewis State Bank*, 341 So.2d 1025 (Fla. App.1977). Secondly, the processing center has no way to judge the genuineness of a check or the sufficiency of the customer's funds to pay it. Thus the court cannot find that respondent's check was presented on the payor bank, the Hailey branch, when the check arrived at the Boise data processing center. Rather, it was presented when it arrived at the Hailey office with the indorsements of all previous transferors (including the Boise branch) as the culmination of the collection process.

Although the Hailey branch has not received presentment by the data processing center's receipt of a check, the "process of posting" has begun. "The usual procedure followed by a payor bank in determining to pay an item and in recording payment" is called the "process of posting." I.C. § 28–4–109. This process may involve numerous steps, including but not limited to:

(a) verification of any signature;

(b) ascertaining that sufficient funds are available;

(c) affixing a "paid" or other stamp;

(d) entering a charge or entry to a customer's account;

(e) correcting or reversing an entry or erroneous action with respect to the item.

*Id.* "It is clear from [the] statutory definition that the 'process of posting' involves both a [subjective] decision to pay on the part of the bank and a series of objective mechanical steps necessary to memorialize that decision." B. Clark & A. Squillante, The Law of Bank Deposits, Collections and Credit Cards, at 123 (1970). Thus "posting is a 'process' which requires more than mere debiting of the customer's account." *Id.* The first element in the process is judgmental: the decision to pay an item. Reference must be made to a customer's account *before* deciding whether to pay an item. *Subsequent* to the decision to pay a check, a bookkeeping entry must be made to memorialize the decision.

First Security's data processing system has been designed to allow the collecting bank to both determine the status of the drawer's account and debit the account *before the check reaches the payor bank for a decision on whether to pay it.* Thus when the data processing center advises a branch of an account's status, the report is merely tentative, particularly for branches far from the processing center. For this reason the data processing center is not permitted to decide to dishonor a check; only the branch may make that decision after checking for recent deposits. Similarly, any debit to a customer's account for the amount of a check is tentative because it is made prior even to any determination of the validity of the check. Thus the entry might be reversed for any number of reasons, including a forged signature or a bank officer's decision to dishonor a check the computer has posted against insufficient funds.

This system is designed around a collecting bank because such a bank receives checks from numerous branches, which allows economical data processing for large numbers of accounts. The tentative entries made by the collecting bank are acceptable because, on the average, only one-eighth of one percent (in dollar amount) of checks are not good. Leary, *Check Handling under Article Four of the Uniform Commercial Code*, 49 Marq.L.Rev. 331, 336 (1965). Thus the vast majority of these entries are never reversed. Nevertheless, the fact that the processing center collects and transmits the account number and amount of a check as the checks are being handled in the collection process does not mean that the processing center has assumed the role of a payor bank or that it has received presentment. Thus in the instant case, the payor bank's midnight deadline must be calculated from the time the check is truly presented to and received by the Hailey branch: the physical arrival of the check at the Hailey office.

This court also rests its decision on I.C. § 28–4–106. As drafted by the sponsors of the Uniform Commercial Code, this provision initially read:

4–106. Separate office of a bank.—A branch or separate office of a bank [maintaining its own deposit ledgers] is a separate bank for the purpose of computing time within which and determining the place at or to which action may be taken or notices or orders shall be given under this chapter and under chapter 3.

When this section was adopted by the legislature, the portion in brackets was omitted. 1967 Idaho Sess.Laws, ch. 161, p. 454. The deletion of this portion reflects that the legislature recognized that under modern, computerized branch banking—particularly in a rural state with many but widely separated branch banks—individual branches might not keep what might be characterized as "deposit ledgers." The legislature apparently intended that, insofar as computing the time necessary to perform certain functions, a branch should not lose its identity as a separate bank merely because it combines mechanical bookkeeping procedures with other branches and has them performed at a central location. The effect of this section, then, is to give a branch bank that is a payor bank its own midnight deadline for carrying out its duties as a payor, even if it keeps no "deposit ledgers" or similar books:

Under this section, if a bank having a branch receives at its downtown office an item drawn on the branch, the downtown bank would have until midnight Tuesday to send to the branch an item received on Monday, and the branch would have until midnight Wednesday to decide whether to pay or dishonor the item.

B. Clark & A. Squillante, The Law of Bank Deposits, Collections and Credit Cards, at 101 (1970). See also 3 Anderson Uniform Commercial Code § 4–106 et seq. pp. 180–86 (1971).

Idaho Code § 28–4–106 thus requires that the Hailey branch be given its own midnight deadline in computing the time in which respondent's check had to be dishonored or paid. The result is not different merely because the Boise data processing center makes tentative entries in customers' accounts based upon information gathered in the collection process.

The court notes that this holding is in conflict with *Farmers & Merchants Bank of Long Beach v. Bank of America Nat'l Trust & Savings Ass'n,* 20 Cal.App.3d 939, 98 Cal. Rptr. 381 (1971), which was relied upon by respondent before this court and by the district court in reaching its decision. In this case, Farmers & Merchants gave a Bank of America messenger checks drawn on Bank of America branches. The checks were taken to a data processing center where they were sorted. The checks were then sent to a computer center where the bookkeeping for all Bank of America branches was performed, and later to the branches on which they were drawn. Bank of America urged that the time for computing the midnight deadline did not begin to run until the checks arrived at the individual branches. Nevertheless, both the trial court and the California Court of Appeal held that the time began to run when the checks arrived at the computer center, on the rationale that because the computer center did the bookkeeping for the branches, it was a part of each branch. Although *Farmers & Merchants* is distinguishable from the instant case in several respects, the principal difference lies in the role of the computer center in the process of paying the checks. In *Farmers & Merchants* the scenario is one of two banks immediately exchanging checks drawn on each other just as they would across a clearing house table. Unlike the instant case, there is no intermediary indorsing bank acting as a collecting agent between distant depositary and payee banks. In *Farmers & Merchants* the computer center performed no tasks that might be characterized as incidental to the functions of a collecting bank. Also, there is no mention in *Farmers & Merchants* of any statute analogous to I.C. § 26–1017.

Further research has also revealed a more recent case that reaches a result similar to

that of the California Court of Appeals, but under circumstances readily distinguishable from the case at bar. *Capital City First Nat'l Bank v. Lewis State Bank*, 341 So.2d 1025 (Fla.App.1977). In this case Lewis State Bank, a Tallahassee bank, furnished computer processing services to Florida State Bank, another Tallahassee Bank. Florida State then directed the Tallahassee clearing house to deliver all checks drawn on Florida State to Lewis State Bank's data processing and computer center. The Florida Court of Appeals ruled that the time for Florida State's midnight deadline began to run when the checks arrived at the processing center, for two reasons. First the contract between the two banks had as its purpose "the performance by Lewis, for a fee, of functions which in law constitute presentment of Florida State's checks." *Id.* at 1035. Secondly, Florida State's directive to the Tallahassee clearing house had the effect of designating Lewis State Bank's processing center as the place of presentment. Thus the checks were "presented to" and "received by" Florida State when they arrived at the data processing center. The facts in *Capital City* are distinguishable in several respects from those in the instant case. First, the Florida court was dealing with banks in the same city and governed by a clearing house arrangement whereby Florida State in fact *directed that "presentment" be made at Lewis State Bank*. The instant case deals with more distant banks; also the record in this case contains nothing to indicate any directive from First Security Bank to Twin Falls Bank & Trust that checks drawn on particular branches are to be *"presented" at Boise*. The Florida court may also have believed that it was not commercially reasonable for two Tallahassee banks in the roles of depositary and payee banks to have between them an in-termediary collecting bank. And just as in the *Farmers & Merchants* case, there is nothing in the court's decision to indicate that Florida has enacted a statute similar to I.C. § 26–1017. Because this case, like *Farmers & Merchants*, is distinguishable on these and other grounds, this court declines to adopt its reasoning.

In reaching today's decision, this court has been careful not only to respect the integrity of the collection process and the judgment of the legislature in its choice of language in I.C. § 28–4–106, but also the purpose of I.C. § 28–4–302: "The policy behind the provision is to reduce 'float' and to encourage the prompt return of dishonored checks so that there will be a minimum of sand in the wheels of the bank collection system as it processes its millions of items each day." B. Clark & A. Squillante, The Law of Bank Deposits, Collections and Credit Cards, at 69 (1970). The court has also attempted to conform its decision to recognized practices in commercial banking. We note that high-speed check processing equipment is being widely employed to reduce the time and costs of processing the increasing number of checks being written in this state. Were this court to adopt the rationale of the district court, branch banks like appellant Hailey branch might be required (1) to forego use of such equipment completely and process checks by methods used decades ago; (2) to obtain and use this equipment in every branch office; or (3) to leave the entire process of posting to a computer center located perhaps hundreds of miles from the local branch.[8]

### D. *Ultimate Conclusion*

The summary judgment entered by the district court is therefore reversed. The case is remanded for further proceedings, including a ruling as to whether appellant

8. The court notes that the legislature has encouraged the development of branch banks in Idaho. Not only has it established flexible requirements for branch banks, I.C. § 26–1001, but also allows branches to establish "bank agencies" to perform many of the functions of a bank. I.C. §§ 26–1301 to 08. The legislature has also permitted the use of customer-bank communication terminals and freed them from the requirements for a branch bank. I.C. § 26–1018. Whether the legislature's purpose is to promote banks in small towns where only a branch might be profitable or to assure sufficient aggregation of capital to finance agricultural and industrial development in our young state (or both) is not clear. It is plain, however, that the legislature has sought to encourage a strong branch banking system in Idaho.

Hailey branch "settled" for respondent's check within the time required by I.C. § 28–4–302.

■ Because there is nothing in the record to indicate that the district court awarded respondent attorney fees, the propriety of any award cannot be addressed by this court. For the guidance of the district court on remand, however, the court now advises that an action based on I.C. § 28–4–302 for late return of an item is not an action "on a negotiable instrument" within the meaning of I.C. § 12–120(2).[9] The court is persuaded by the reasoning in *Security Bank & Trust Co. v. Federal Nat'l Bank & Trust Co. of Shawnee*, 554 P.2d 119 (Okl. App.1976), and *Goodman v. Norman Bank of Commerce*, 565 P.2d 372 (Okl.1977), that such a suit is not an action to recover on the instrument itself but is a suit for the wrongful manner in which the instrument was handled by the payor bank. Accordingly, I.C. § 12–120 cannot form the basis of an award of attorney fees to the prevailing party in this case.

Reversed and remanded for further proceedings in conformity with the views expressed herein. Costs to appellant.

DONALDSON, BAKES and BISTLINE, JJ., concur.

DUNLAP, District Judge (Ret.), dissenting.

I respectfully dissent for the reason that there has obviously been no final judgment entered in this case as the issue of attorney fees was specifically reserved by the district court in its partial summary judgment. Because of this fact the partial summary judgment can in no way meet any of the tests of appealability set forth by Idaho Appellate Rule 11. The issue of attorney fees was seriously contested in district court. The allowance or disallowance of attorney fees under Idaho Code § 12–121 requires the exercise of judicial discretion on the part of the trial judge, and according to the record on appeal this was never done.

The allowance or disallowance of attorney fees is an important and serious matter to the litigants involved and in some cases can involve many thousands of dollars. This court should not brush this matter aside as is done by the majority by merely stating without reason or citation of authority that attorney fees are now classified as costs and that therefore the partial summary judgment was indeed a final judgment.

The decision of the majority has the effect of amending I.R.C.P. 54(d)(1) by adding thereto an additional item of costs, that is, attorney fees. Attorney fees are not listed in said rule which was in effect at the time of entry of the partial summary judgment. I can find no precedent for such a decision. Litigants should be able to rely on the rules of procedure of this court in effect at the time of trial.

It is my opinion that this court is without jurisdiction to entertain this appeal and that it should be dismissed.

---

**9.** Idaho Code § 12–120(2) provides:

In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.