Argued and submitted July 11, reversed and remanded with instructions November 16, reconsideration denied December 16, 1983, petition for review denied January 10, 1984 (296 Or 253)

# SOUTH SOUND NATIONAL BANK,
*Appellant,*

*v.*

# FIRST INTERSTATE BANK,
*Respondent.*

(81-2343; CA A27078)

672 P2d 1194

Paul J. DeMuniz, Salem, argued the cause and filed the briefs for appellant. With him on the briefs was Garrett, Seideman, Hemann, Robertson & DeMuniz, P.C., Salem.

Lee C. Nusich, Portland, argued the cause and filed the brief for respondent.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

YOUNG, J.

## YOUNG, J.

This appeal concerns the timeliness of the dishonor of two worthless checks by the Waverly Branch of First Interstate Bank. The trial court found the dishonor timely and granted First Interstate's cross motion for summary judgment. On appeal, South Sound National Bank (South Sound) contends that the dishonor was not timely, because it did not meet the "midnight deadline" prescribed by ORS 74.3020.[1]

On June 19, 1981, one Van Dyken drew a check in the amount of $12,000 on his account at the Waverly Branch. On June 22, Van Dyken deposited the check in his account at South Sound. South Sound cleared the check through the Portland Branch of the Federal Reserve Bank. On Friday, June 26, Federal Reserve transferred the check to the head office of First Interstate in Portland. The check first went to the data processing center, which is located in the head office.

At the data processing center, checks are computer sorted by branch and account number and "captured." Information captured by the computer includes the bank transit number, the customer account number and the check amount. Usually all checks are captured by 4 a.m. on the day following receipt by the data processing center. At that point, the computer also prints a list of "referred items" or problem checks. The captured checks are then physically sorted according to branch and delivered to the Accounts Service Center, where employes go through the referred items list and separate the problem checks. The Waverly Branch receives a copy of the referred items list by motor messenger. On receipt of the list the branch then makes a decision whether to honor a problem check or to return the check to the prior endorser. That decision is communicated to the Accounts Service Center, which has physical possession of the check.

On Monday, June 29, 1981, the Waverly Branch informed the Accounts Service Center that Van Dyken's check was not to be honored. The check was then taken to the

---

[1] *See South Sound Nat'l Bank v. Citizens Valley Bank,* 65 Or App 562, 672 P2d 1198 (1983), concerning the same issue.

returned items department in the head office at approximately 5 p.m. that day. The check was returned to Federal Reserve before 10 a.m. on Tuesday, June 30, 1981.

On June 22, 1981, Van Dyken drew a second check on his Waverly Branch account in the amount of $8,500 and also deposited it to his account at South Sound on June 29. That check was received by the First Interstate data processing center from the Federal Reserve Bank on July 1, 1981. It then followed essentially the same path as the first check. It was dishonored by the Waverly Branch and returned to Federal Reserve on Monday, July 6, 1981, before 1 a.m.

ORS 74.3020(1) provides:

> "In the absence of a valid defense such as breach of a presentment warranty pursuant to ORS 74.2070(1), settlement effected or the like, *if an item is presented on and received by a payor bank the bank is accountable for the amount of:*
>
> "(1)  *A demand item* other than a documentary draft whether properly payable or not *if the bank,* in any case where it is not also the depositary bank, *retains the item beyond midnight of the banking day of receipt without settling for it or,* regardless of whether it is also the depositary bank, *does not pay or return the item or send notice of dishonor until after its midnight deadline;* * * *." (Emphasis supplied.)

ORS 74.1040(1)(h) defines midnight deadline:

> " 'Midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later."

Under ORS 74.3020(1), a payor bank is liable to pay the check if the bank, after it has been "presented and received" does not settle for, pay, return or send notice of dishonor until after the midnight deadline.

South Sound argues that the time period for the Waverly Branch, as the payor bank, to pay or dishonor the first check began when the check was received by First Interstate's data processing center on Friday, June 26.

Excluding Saturday and Sunday[2] as nonbanking days, the time period for dishonor of the check would end at midnight on Monday, June 29, and the return of the check on Tuesday, June 30, was untimely. Similarly, South Sound argues that the time period for dishonor of the second check ended at midnight on Thursday, July 2, and return of the check on Monday, July 6, was untimely.

■        The precise issue is whether the checks were "presented on and received by" the Waverly Branch under ORS 74.3020(1) when the checks were received and processed by First Interstate's data processing center. Our analysis includes consideration of ORS 74.1060, which provides:

> "(1)   A branch or separate office of a bank is a separate bank for the purpose of computing the time within which and determining the place at or to which action may be taken or notices or orders shall be given under ORS 73.1010 to 73.8050 and 74.1010 to 74.5040."

The question is one of first impression in Oregon. The Idaho and Alabama Supreme Courts have considered the question under statutes identical to ours and have come to inconsistent conclusions. *See Idah-Best Inc. v. First Sec. Bank, etc.,* 99 Idaho 517, 584 P2d 1242 (1978); *Central Bank of Alabama v. Peoples Nat. Bank,* 401 So 2d 14 (Ala 1981). We examine the facts, reasoning and policy of each of those cases for guidance in interpreting our own statutes.[3]

In *Idah-Best Inc. v. First Sec. Bank, etc, supra,* a check drawn on the Hailey Branch of First Security Bank was deposited at Twin Falls Bank and Trust. The check was delivered to the data processing center at First Security's Boise Branch. The data processing center transmitted the amount of each check to First Security's Salt Lake City computer. The computer transmitted back to Boise a list of problem checks including the check in question. The check was physically sent to the Hailey Branch, where it was dishonored for insufficient funds. The Idaho court held that

---

[2] "Banking day" is defined by ORS 74.1040(c):

" 'Banking day' means that part of any day on which a bank is open to the public for carrying on substantially all of its banking functions."

[3] Commentators have taken divergent views. *See* Bailey, *Brady on Bank Checks,* § 14.10 (5th ed, Supp No. 2, 1983); Clark, *The Law of Bank Deposits, Collections and Credit Cards,* § 3.4[(9)] (Supp No. 1, 1983).

the check was "presented on and received by" the Hailey Branch only when the check physically arrived at the Hailey Branch.

The Idaho court recognized that the Boise data processing center performed functions traditionally performed by a payor bank in recording payment of a check. *Idah-Best Inc. v. First Security Bank, supra,* 99 Idaho at 524. However, the court reasoned that "presented on and received by" means received by one with the authority to either honor or dishonor. *Idah-Best Inc. v. First Security Bank, supra,* 99 Idaho at 525. Only the Hailey Branch could decide whether to honor or to dishonor. Therefore, the court concluded that the time period began to run only when the check was physically received by the Hailey Branch.

In *Central Bank of Alabama v. Peoples Nat. Bank, supra,* a check drawn upon the Florence Branch of Central Bank was deposited at the Dunnavant's Mall Branch of People's National Bank of Huntsville. The check was cleared through the Federal Reserve Bank and sent to Central Bank's Decatur data processing center, which performed basic bookkeeping and accounting functions. The Florence Branch made the final decision whether to pay or dishonor the check. The court held that the time period began to run when the check arrived at the data processing center. The court reasoned that, although the Florence Branch was a "separate bank" under Ala. Code § 7-4-106,[4] the data processing center was an integral part of the branch. The court explained that the purpose of the midnight deadline is to encourage prompt return of dishonored checks. "[T]o permit delay of the beginning of the running of the midnight deadline would have the effect of allowing the payor bank to unilaterally decide when the deadline would begin to run by the simple device of choosing the time to forward the check to the branch." *Central Bank of Alabama v. Peoples Nat. Bank, supra,* 401 So 2d at 19.

The basis of the Alabama holding is that the data processing center's bookkeeping and accounting functions are essential steps employed by a payor bank in making a decision to pay or to dishonor a check. The Alabama court reasoned that the functions performed at the data processing center made that center an integral part of each branch served.

---

[4] Alabama Code § 7-4-106 is identical to ORS 74.1060.

In this case, First Interstate's data processing center performed virtually every step required of a payor bank except to make the final determination to dishonor. The determination to dishonor was made over the telephone after the Waverly Branch received the referred items list. The Waverly Branch never had physical possession of the checks.[5]

We agree with the reasoning of the Alabama court and hold that the First Interstate data processing center is an integral part of its Waverly Branch. To hold otherwise would be to distinguish between banks which perform essential bookkeeping and accounting functions on-premise and banks which perform such functions off-premise. We agree with the Alabama court that such a distinction would allow payor banks to decide unilaterally when the deadline begins to run. Such a result is inconsistent with the policy of prompt return of dishonored checks that underlies ORS 74.3020. Receipt of the first check at First Interstate's data processing center on Friday, June 26, triggered the midnight deadline. The Waverly Branch had until midnight on Monday, June 29, to return the check or give notice of its dishonor. The check's return on Tuesday, June 30, was untimely. The second check was received by the data processing center on Wednesday, July 1. The deadline for dishonor ran at midnight on July 2. The check's return on July 6 was untimely.

■     The last question is whether a Federal Reserve Bank policy that it will not process "return items" received after 4 p.m. until the next banking day has the effect of extending the payor bank's statutory midnight deadline. ORS 74.3020(1). ORS 74.1030 provides:

"The effect of the provisions of ORS 74.1010 to 74.5040 may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.

---

[5] The trial court held that the Waverly Branch dishonor was timely but did not specify when the midnight deadline counting began. First Interstate argues on appeal that it began when the Accounts Service Center of the head office received the checks. South Sound assumed First Interstate's argument to be that the period began to run when the referred item list physically arrived at the Waverly Branch.

"(2) Federal reserve regulations and operating letters, clearing house rules, and the like, have the effect of agreements under subsection (1) of this section whether or not specifically assented to by all parties interested in items handled."

Because First Interstate and South Sound use the Federal Reserve System for the collection and return of checks, each is bound by Federal Reserve Bank regulations. 12 CFR 210.3(a), (b) (1983) provide:

"(a) General. Each Reserve Bank shall receive and handle items in accordance with this subpart, and shall issue operating circulars governing the details of its handling of items and other matters deemed appropriate by the Reserve Bank. The circulars may, among other things, classify cash items and noncash items, require separate sorts and letters, and provide different closing times for the receipt of different classes or types of items.

"(b) Binding effect. This subpart and the operating circulars of the Reserve Banks are binding on the sender of an item, on each collecting bank, paying bank, and nonbank payor, to which a Reserve Bank (or a subsequent collecting bank) presents or sends an item, and on other parties interested in the item, including the owner."

When the checks in question were dishonored by the Waverly Branch, they were sent to the return items department of the head office on June 29 and July 2, respectively. The checks were delivered to the Portland Branch of the Federal Reserve Bank at roughly 8:10 a.m. the next banking day, June 30 and July 6, respectively. If a check is returned to the Federal Reserve Bank before 10 a.m., the check will be processed as if it had been received before 4 p.m. on the previous banking day.

First Interstate argues that ORS 74.1030(2) and 12 CFR 210.3(a) and (b) have the effect of creating, as a matter of law, an agreement between the parties and that First Interstate, by complying with Federal Reserve Bank policy, met the midnight deadline. We disagree. The Federal Reserve Bank policy merely establishes its own daily closing time, after which it will not handle return items. The cited statute and regulation do not create an agreement between the parties to *extend* the statutory midnight deadline. To hold otherwise would emasculate the statutory deadline and defeat its

obvious purpose, which is to encourage the prompt notice or return of dishonored checks.

Reversed and remanded for entry of judgment for plaintiff.