**SASS TRUCKING, INC., Appellee,**

v.

**SECURITY BANK AND TRUST COMPANY, Blackwell, Oklahoma, Appellant.**

**No. 62621.**

Supreme Court of Oklahoma.

May 5, 1987.

Guy Clark, Northcutt, Raley, Clark and Gardner, Ponca City, for appellee.

James R. Rodgers, Blackwell, for appellant.

Laura N. Pringle, Vice President and Gen. Counsel of the Oklahoma Bankers Ass'n, Oklahoma City, for amicus curiae Oklahoma Bankers Ass'n.

OPALA, Justice.

The narrow first-impression question for today's decision is whether a data processing center, sole agent for the payor bank, is a place of presentment for items triggering the "midnight deadline rule" of 12A O.S. 1981 § 4–302.[1] We answer in the affirmative and hold that the check-collecting

---

1. The terms of 12A O.S.1981 § 4–302 provide: "In the absence of a valid defense such as a breach of a presentment warranty (subsection (1) of Section 4–207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of

    (a) a demand item other than a documentary draft whether properly payable or not *if the bank*, in any case where it is not also the depositary bank, *retains the item beyond mid-* *night of the banking day of receipt without settling for it* or, regardless of whether it is also the depository bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or

    (b) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents." [Emphasis added.]

process, together with the constructive designation by the payor bank, constituted presentment at the data processing center for purposes of the midnight deadline rule.

## PROCEDURAL HISTORY

Sass Trucking, Inc. [Sass], appellee, brought an action against Security Bank and Trust Company of Blackwell [Security or payor bank], appellant, to recover the amount of six checks drawn upon it as payor bank, which were made payable to Sass. The petition asserted a claim on two alternative theories; one based on 12A O.S. 1981 § 4–302 which sets a midnight deadline for the timely dishonoring of checks, and the other alleged that sufficient funds were available for collection during the time period in question. The trial court found after a bench trial that (a) the data processing center was not a collecting bank within the chain of check processing; (b) as to each of the six checks in contest, the bank failed to return the checks by its midnight deadline and (c) by its failure, the bank became legally accountable for the amount of the checks. Judgment was rendered for Sass in the sum of $19,827.09 plus interest and court costs.

## ANALYSIS OF CHECK PROCESSING FUNCTION

Sass received six checks from Gordon Riecken which were drawn upon Security. Sass deposited the checks to its account at the Bank of Bennington in Bennington, Nebraska. The checks arrived in this state at the Oklahoma City branch of the Federal Reserve Bank. They were then dispatched by courier to First Data Management Corporation [FDMC], a data processing center located in Oklahoma City, leaving the Federal Reserve Bank at 2 a.m. and arriving at the data processing center at 9 the same morning. The checks were then sent from FDMC to the payor bank [Security] and arrived at 8 a.m. the next morning before the staff entered the bank. Each time the checks reached FDMC on one banking day,

they were delivered to the payor bank on the next banking day, and then were returned to Sass's bank in Nebraska the following day.

The FDMC processed and posted checks for Security. Its tasks consisted of posting books, sorting the checks in numeric sequence so that the payor bank could file them in the customer's account and printing reports that showed sufficient items and those that were rejected. FDMC's service, in effect, took the place of the bank's bookkeeping department by carrying out the electronic process for the bank. The data processing center would pay on the customer's account unless the check was "kicked out"[2] for insufficient funds or for some other reason. Kicked-out checks are sent back to the bank, and the accounts are manually pulled to determine if the problem was attributable to a wrong number or to insufficient funds. The payor bank then makes its decision to dishonor.

FDMC did not have a connection with any government agency. It is a private bookkeeping computer service that had a written agreement with Security authorizing it to accept cash letters from the Federal Reserve Bank's courier on Security's behalf. In performance of the bank's particular cash letter and check sorting functions, FDMC is entirely under Security's employ or is the bank's agent. In essence, the facts reveal that payor bank had moved its bookkeeping to an external source.

## I

The Code provisions that govern presentment, dishonor and the applicable deadline are pertinent to our consideration of whether the receipt of checks by FDMC triggered the running of the midnight deadline for the return of the checks.

Presentment is a demand for acceptance or payment made upon the maker, acceptor, drawee, or other payor by or on behalf of the holder. § 3–504(1). A payor bank is liable to pay the check if the bank, after the item has been "presented and re-

---

**2.** The term "kicked out" means that, for purposes of a report utilized by the data processing center, a check has been separated from the others. The actual manual separation of the checks does not occur until they reach the payor bank.

ceived," does not settle for, pay, return or send notice of dishonor until after the midnight deadline. § 4–301(1). If a bank decides to dishonor a check drawn on it, notice must be given to the party presenting the check for payment. Sections 3–508(2), 4–301 and 4–302 of the Code govern the payor bank's ability to dishonor an item. Section 3–508(2) provides that any notice of dishonor "must be given by a bank before its midnight deadline." The midnight deadline, with respect to a bank, "is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." § 4–104(1)(h). A "banking day" under § 4–104(1)(c) means "that part of any day on which a bank is open to the public for carrying on substantially all its banking functions."

## II

Check sorting by computer is done either internally at the payor bank or externally at another location designated by the payor bank to perform this function. The checks in contest went through a data processing system that was separate from the bank site. Security employed FDMC to perform duties that otherwise would have been handled within the bank. By the time the case came to trial, Security had established its own data processing center at the bank and checks were being forwarded directly to it. Testimony of bank employees revealed that when Security had its own computer the time interval allowed for the check processing was no different from that when FDMC performed these duties. Items from the Federal Reserve Bank arrived at the same time—9 a.m.—regardless of whether they were sent first to a data processing center or directly to the bank. The first banking day of receipt is used to sort the items either at the bank, if the bank has its own computer, or at the data processing center. The record clearly demonstrates that no time is lost in transporting the items from a data processing center to the bank because the items are waiting for the bank staff on the morning of the second banking day. According to the tes-timony, the process of pulling and dishonoring items is made on the second day even if the processing is done by the bank's own computer service. In essence, we cannot find on this record that there would be greater hardship for banks which employ a data processing service than for those that maintain one as an on-site facility.

Presentment should not be governed here by strict construction of the agreement between the parties nor by mere technicalities. Upon its physical arrival at the payor bank, an item is stamped by an employee who is without power to dishonor, while a data processing center does not affix a stamp. Because the receiving and sorting of checks is identical in both situations, "stamping" is merely a formality for midnight deadline purposes and is not critical to presentment. The item would be received either by the bank's employee or by its agent. The focus of the agreement between the payor bank and the data processing center should be on the content and the duties to be performed under the written agreement rather than on mere formalities. Banks could otherwise circumvent midnight deadlines by leaving out legal terms in its contracts such as "presentment" and focusing on formalities such as stamping. At best Security asserts a very narrow interpretation of presentment. It would require presentment to have a physical situs at the same place as where the power to dishonor resides. Arguably then, even under a direct system where the bank has its own computer, presentment will not be made until the second banking day because the people sorting the items do not have the power to dishonor. We choose a more realistic interpretation. Based on the circumstances of this case, the process of deciding whether to pay begins on the first banking day of the item's receipt. It is logical to extend presentment to the data processing center when it performs the same duties which begin the process of dishonor.

Security argues that Oklahoma's Code provisions governing "presentment" do not allow such a result because a necessary provision that is found in the statutory

scheme of many other states is omitted from 12A O.S.1981 § 4–204. Subsection (3) of the cited section, which was not adopted in Oklahoma, provides:

"(3) Presentment may be made by a presenting bank at a place where the payor bank has requested that presentment be made."

Security reasons that since Oklahoma's version of § 4–204, which lists the methods of sending and presenting checks by a collecting bank, does not contain the quoted text in the section, presentment must be made directly to the payor. Had this section been in our statutory scheme, it may have removed some doubt but it does not necessarily follow that its absence requires a different result. Its omission only stresses the importance of conformity when applying the midnight deadline rule. The purpose of the rule is to allow adequate time for processing of checks as well as to increase efficiency from the customer's standpoint. The trial court correctly foresaw a danger of payor banks decreasing efficiency by attempting to capture float benefits if they are not required to pay for one additional day. Banks could also manipulate the midnight deadline by controlling the time to forward the check from the data processing center.[3]

Other jurisdictions offer little guidance on the issue before us. They analogize data processing centers to collecting banks without really taking into account the practicalities of transporting items from off-premises data processing centers to the payor bank.[4] This makes it very difficult to reconcile the various decisions from other jurisdictions.[5] Some courts have gone so far as to allow presentment at the data processing center where the payor bank never had physical possession of the check.[6]

Security Bank relies heavily on *Idah-Best, Inc. v. First Sec. Bank, Etc.,*[7] which required physical presentment of the check at the physical site of the payor bank to trigger the midnight deadline. This case dealt with a branch-banking system. It is true that the heart of that appeal may have been whether the branch bank initiated, as a data processing center, the payment process. But the "heart" cannot be easily severed from the rest of the body which is the branch-banking system. The branch bank is distinguishable; it has its own goals and priorities that are different from the present case. The latter falls into a gray area simply because a branch bank is more easily identifiable. We do not hold that a branch bank operating in good faith —12A O.S.1981 § 4–103—does not have its own separate midnight deadline. *We are concerned here with a data processing center that is not a part of the branch-banking system.*

In its argument below Security analogized tasks performed by FDMC to those

**3.** *Central Bank of Alabama v. Peoples Nat. Bank,* 401 So.2d 14, 19 [Ala.1981].

**4.** See *Idah-Best, Inc. v. First Sec. Bank, Etc.,* 99 Idaho 517, 584 P.2d 1242 [1978]; *Catalina Yachts v. Old Colony Bank & Trust Co.,* 497 F.Supp. 1227, 1230 [D.C.Mass.1980] and *Bon Bon Productions, Ltd. v. Xanadu Productions, Inc.,* 32 U.C.C.R.S. 253 [F.D.C.Mass.1981].

**5.** For the purposes of determining the midnight deadline courts have taken differing positions on the question of when a payor bank—which uses off-premises computer processing for sorting, coding and endorsing checks and making entries on its customers' accounts—has received an item. [A] Some courts have held that an item is received when it is delivered to the payor bank. See *Idah-Best, Inc. v. First Sec. Bank, Etc., supra* note 4; *Catalina Yachts v. Old Colony Bank & Trust Co., supra* note 4 and *Bon Bon Productions, Ltd. v. Xanadu Productions, Inc., supra* note 4. Each of these cases involved a branch-banking scheme. [B] Other jurisdictions have held that an item is received when it is delivered to the computer processing center. See *Central Bank of Alabama v. Peoples Nat. Bank, supra* note 3; *Capital City First Nat. Bank v. Lewis State Bank,* 341 So.2d 1025 [Fla.App. 1977]; *Go-Tane Service Stations, Inc. v. Sharp,* 78 Ill.App.3d 785, 33 Ill.Dec. 916, 397 N.E.2d 249 [1979]; *South Sound Nat'l Bank v. First Int. Bank,* 65 Or.App. 553, 672 P.2d 1194 [1984]; *Chrysler Credit Corp. v. First Nat. Bank & Trust,* 582 F.Supp. 1436 [W.D.Pa.1984] and *Farmers & Merchants Bank v. Bank of America N.T. & S.A.,* 20 Cal.App.3d 939, 98 Cal.Rptr. 381 [1971].

**6.** *South Sound Nat'l Bank v. First Int. Bank, supra* note 5 and *Chrysler Credit Corp. v. First Nat. Bank & Trust, supra* note 5.

**7.** See footnote 4 *supra* at 1249.

of a collecting bank. It asserted that, because FDMC collects and processes the checks, it neither assumed the role of a payor bank nor received presentment. The trial court found that FDMC was not a collecting bank within the chain of check processing. Security does not reassert this argument on appeal; rather, it contends here that in either event Sass could have, but did not, designate FDMC as the place for presenting the check for payment. In *Idah-Best* [8] the data processing center was treated as a collecting bank so that presentment was made only when the item was actually delivered to the payor bank.[9] The "collecting-bank status" analysis, which suggests that mere check processing functions should not be used as a basis for imposing payor bank duties, is muddled and difficult to apply. States are consequently split as to when the midnight deadline applies. The Uniform Commercial Code offers no guidance because it left unaddressed presentment problems that occur in the context of data processing centers and midnight deadlines. We choose to look at the facts of the case and keep in mind, as we must, that the original intent of the drafters of the midnight deadline rule was to afford fairness to customers and banks alike. *We accordingly hold that FDMC's receipt of the items here in contest did constitute presentment within the meaning of § 4–302 and hence triggered the "midnight deadline rule."*

*In short, we conclude that, under the record before us, the data processing center is to be treated as an in-house facility* because the bookkeeping and accounting functions that were performed for Security by FDMC were an integral part of the bank's processing of checks. The rationale applied to branch banks is neither apposite here, nor are the cases from various jurisdictions that dealt with them readily reconcilable. Some states, unlike Oklahoma, have enacted a Code provision [10] which accords each branch "separate bank status" for the purpose of computing time limitations.[11] The centralized data processing offices for the branches are deemed to be collecting banks so that presentment occurs only when the item is actually delivered to the payor bank.[12] Other jurisdictions with a branch-banking system have treated the central data processing center as an integral part of the bank branch on which the item was drawn, thus making delivery to the center equivalent to presentment to the branch.

The trial court's judgment is affirmed.

HARGRAVE, V.C.J., and HODGES, LAVENDER, SIMMS, ALMA WILSON, KAUGER and SUMMERS, JJ., concur.

DOOLIN, C.J., dissents.

8. *Idah-Best, Inc. v. First Sec. Bank, Etc., supra* note 4.

9. Subsequently some courts have reached similar conclusions in cases where a collecting bank additionally provides data processing services for the payor bank. *Catalina Yachts v. Old Colony Bank & Trust Co., supra* note 4 and *Bon Bon Productions, Ltd. v. Xanadu Productions, Inc., supra* note 4.

10. The terms of the pertinent UCC provision, § 4–106, are:
"A branch or separate office of a bank [maintaining its own deposit ledgers] is a separate bank for the purpose of computing the time within which and determining the place at or to which action may be taken or notices or orders shall be given under this Article and under Article 3."
Some states include the bracketed language so that "separate bank status" is accorded only if the branch maintains its own deposit ledgers.

11. *Idah-Best, Inc. v. First Sec. Bank, Etc., supra* note 4; *Catalina Yachts v. Old Colony Bank & Trust Co., supra* note 4 and *Bon Bon Productions, Ltd. v. Xanadu Productions, Inc., supra* note 4.

12. *Central Bank of Alabama v. Peoples Nat. Bank, supra* note 3 and *Chrysler Credit Corp. v. First Nat. Bank & Trust, supra* note 5.